IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

MCALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 7:19-CR-522-2 |
| | § | MCALLEN, TEXAS |
| VERSUS | § | FRIDAY, |
| | § | AUGUST 2, 2019 |
| JOHN F. CUELLAR (2) | § | 10:03 A.M. TO 11:13 A.M. |

FINAL PRETRIAL CONFERENCE/REARRAIGNMENT
(PARTIAL TRANSCRIPT – EXCLUDES SEALED BENCH CONFERENCE)

BEFORE THE HONORABLE MICAELA ALVAREZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:                          SEE NEXT PAGE

COURTROOM ERO:                        XAVIER AVALOS

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:


FOR THE PLAINTIFF, UNITED          OFFICE OF THE UNITED STATES
STATES OF AMERICA:                    ATTORNEY
                                   Roberto Lopez, Jr., Esq.
                                   1701 W. Highway 83
                                   Suite 600
                                   McAllen, Texas 78501


FOR THE DEFENDANT, JOHN F.         ATTORNEY AT LAW
CUELLAR:                           Ricardo Montalvo, Esq.
                                   7017 N. 10th Street
                                   Suite N2-329
                                   McAllen, Texas 78504


ALSO PRESENT:                      Samantha Solis, Probation

1          McALLEN, TEXAS; FRIDAY, AUGUST 2, 2019; 10:03 A.M.

2          THE COURT:  Thank you.  Good morning.  You may be

3     seated.

4          This Case Number 19-CR-522 as to John Cuellar.

5          MR. LOPEZ:  Good morning, Your Honor.  Bobby Lopez

6     on behalf of the Government, present and ready.

7          MR. MONTALVO:  Good morning, Your Honor.  Rick

8     Montalvo on behalf of Mr. Cuellar.  He's present now.

9          THE COURT:  And ready for?

10          MR. MONTALVO:  For plea, Your Honor, I'm sorry.

11          THE COURT:  To which count, please?

12          MR. MONTALVO:  Count --

13          MR. LOPEZ:  One, Your Honor.

14          MR. MONTALVO:   -- 1, Your Honor.

15          THE COURT:  Thank you.  Mr. Cuellar, please raise

16     your right hand to be sworn in.

17     (Defendant is sworn.)

18          THE COURT:  Mr. Cuellar, your attorney has just

19     indicated that you are ready to enter a plea, so I do need to

20     cover with you certain rights and explain to you certain other

21     matters.  As I do so, if there is anything you do not

22     understand, please make sure to let me know.  I will do my

23     best to explain it in a way that best makes sense.

24          Do you understand this?

25          DEFENDANT CUELLAR:  Yes, Your Honor.

1            THE COURT:  You have just been sworn in, you are

2      under oath, that means that you are subject to the penalties

3      of perjury, and that any statement you make here today can be

4      used against you.

5            Do you understand this also?

6            DEFENDANT CUELLAR:  Yes, Your Honor.

7            THE COURT:  Let me just gather a little bit of

8      background information.  I know some of it is clear from the

9      Record, but nonetheless so that we have it clear on the

10     Record.

11           Mr. Cuellar, first of all, how old are you?

12           DEFENDANT CUELLAR:  I'm 56 years old.

13           THE COURT:  And you are a licensed attorney at this

14     time.  Is that correct?

15           DEFENDANT CUELLAR:  Yes, Your Honor.

16           THE COURT:  And I take it you are a citizen of the

17     United States?

18           DEFENDANT CUELLAR:  Yes, Your Honor.

19           THE COURT:  Are you now or have you ever been under

20     the care of a doctor, psychologist, psychiatrist, any kind of

21     mental health professional for any mental health issues?

22           DEFENDANT CUELLAR:  No, Your Honor.

23           THE COURT:  Are you now under the influence of any

24     alcohol, drugs or medication?

25           DEFENDANT CUELLAR:  No, Your Honor.

1           THE COURT:  And that is no medication of any sort

2    even?  I understood you had some medical conditions?

3           DEFENDANT CUELLAR:  I do, I do have prescription

4    medicines that I take for diabetes and blood pressure.

5           THE COURT:  Okay.

6           DEFENDANT CUELLAR:  And I take Venlafaxine,

7    antidepressant.

8           THE COURT:  And you do take that -- take an

9    antidepressant as well?

10          DEFENDANT CUELLAR:  Yes, Venlafaxine.

11          THE COURT:  And have you been diagnosed with

12   depression?

13          DEFENDANT CUELLAR:  The doctors prescribed it so --

14          THE COURT:  Okay.

15          DEFENDANT CUELLAR:   -- I would guess, yeah.

16          THE COURT:  So you would think so.  Okay.  And about

17   how long have you been taking that medication?

18          DEFENDANT CUELLAR:  More than five years.

19          THE COURT:  During that period of time has there

20   been anything about the fact that you either suffer from

21   depression or take the medication that you feel has interfered

22   with your ability to conduct your day-to-day activities on

23   your own, in other words, have you ever been incapacitated

24   such that you have to have somebody actually caring for you?

25          DEFENDANT CUELLAR:  No, Your Honor.

1          THE COURT:  Okay.  And I take it that you have been

2     taking this medication at least on and off through the period

3     of time that you have been here under investigation and/or

4     indictment?

5          DEFENDANT CUELLAR:  Yes, Your Honor.

6          THE COURT:  Has the fact that you suffer from

7     depression or take the medication in any way interfered with

8     your ability to be able to communicate with your lawyer, to

9     ask questions, to provide information to whatever he has asked

10     of you?

11          DEFENDANT CUELLAR:  No, Your Honor.

12          THE COURT:  Okay.  Is there any reason that you

13     believe, Mr. Cuellar, that you should not be able to go

14     forward here today despite the fact that you suffer from

15     depression and take some medication?

16          DEFENDANT CUELLAR:  No, Your Honor.

17          THE COURT:  Okay.  And in this regard, Mr. Montalvo,

18     have you found there to be any issue regarding Mr. Cuellar's

19     competency?

20          MR. MONTALVO:  No issue regarding competency, Your

21     Honor.

22          THE COURT:  All right.  Thank you.

23          And, Mr. Cuellar, other than the prescription

24     medications that you take have you taken any other kind of

25     alcohol or drugs in the last 72 hours?

1          DEFENDANT CUELLAR:  No, Your Honor.

2          THE COURT:  Have you had sufficient time to talk

3     with your attorney about the charges that you are facing?

4          DEFENDANT CUELLAR:  Yes, Your Honor.

5          THE COURT:  Okay.  I'm going to have the Government

6     actually read the Indictment. It's rather lengthy, and as most

7     of the time I have to be the talking here, I get them to help.

8     So I'm going to have the Government read for us Count 1 of the

9     Indictment only since that is the one that you are going to

10    plead to once the Government does that.  Then I'll come back

11    to it myself.

12          Do you understand that?

13          DEFENDANT CUELLAR:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. LOPEZ:  Thank you, Your Honor.

16          THE COURT:  Mr. Lopez.

17          MR. LOPEZ:  The United States District Court,

18    Southern District of Texas, McAllen Division, United States of

19    America versus John F. Cuellar, Criminal Number M-19-522-S1,

20    Superceding Indictment.  Grand Jury charges in Count 1 a

21    violation of Title 18, United States Code Section 1349,

22    conspiracy to commit online services wire fraud.  At all times

23    relevant to this Indictment with dates, times and amounts

24    being approximates to relevant individuals and entities.

25          Number one, Defendant Ricardo

1    Quintanilla-Quintanilla, also known as Richard, is a

2    businessman who lived and worked in Weslaco, Texas.

3         Two, Defendant Arturo C. Cuellar, also known as AC,

4    is a resident of Progreso Lakes, Texas who served as a

5    Commissioner of Hidalgo County, Texas from March 2010 to

6    November 2010 and approximately January 2013 to December 2016.

7         Three, Defendant John F. Cuellar is an attorney

8    based in Weslaco, Texas who served as a Weslaco City

9    Commissioner from May 1995 to November 2014.  For large parts

10   of his tenure on the Weslaco City Commission, known as the

11   "Commission," including from at least June 2007 to May 2009

12   and from May 2010 to November 2014, John F. Cuellar was

13   selected by the Commission to serve as the Mayor Pro Tem.  As

14   a Commissioner, John F. Cuellar was an agent of the City of

15   Weslaco.

16        Four, Defendant Daniel J. Garcia-Garcia, is an

17   attorney based in Rio Grande City, Texas, who served on the

18   Rio Grande City Consolidated Independent School District Board

19   of Trustees.

20        Five, Leonel, Leo, Lopez-Lopez, is a resident of

21   Starr County, Texas.

22        Six, Geraldo Jerry Tafolla-Tafolla, is a resident of

23   Weslaco, Texas and an elected member of the Commission.

24        Seven, Company A was an international engineering

25   and construction company that performed large-scale

1    infrastructure projects for public and private clients.

2    Person A was an employee of Company A.

3              Eight, Company B was an engineering company based in

4    San Antonio, Texas.  Person B was the owner of Company B.

5              Nine, Company C was an engineering company based in

6    McAllen, Texas.  Person C was the owner of Company C.

7              Ten, Company D was a business entity owned in part

8    by Arturo C. Cuellar, Jr. and based in Corpus Christi, Texas.

9              Eleven, Person D was an attorney based in Houston,

10   Texas.

11             General allegations:  The Weslaco City Commission.

12             Twelve, the Texas Constitution and the laws of the

13   State of Texas and the Charter of the City of Weslaco

14   establish ethical standards of conduct for elected public

15   officials including Weslaco City Commissioners.  These

16   standards included in the oath to faithfully execute the

17   duties of the office of Commissioner and to preserve, protect

18   and defend the Constitution and laws of the United States and

19   the State of Texas.  Accordingly, Commissioners owed a

20   fiduciary duty to the City of Weslaco, the Commission and the

21   people of the City of Weslaco.

22             Thirteen, as officials in the city government,

23   Defendant John F. Cuellar and Tafolla each owed a fiduciary

24   duty to the City of Weslaco and to its citizens to perform the

25   duties and responsibilities of their office free from corrupt

1    influence.  As elected officials in the State of Texas, John

2    F. Cuellar and Tafolla swore to uphold the United States

3    Constitution, the Texas Constitution and the laws of the State

4    of Texas and to faithfully execute the duties of their office.

5         Fourteen, the Commission was authorized to take an

6    official action only when a quorum, a majority of the duly

7    elected Commissioners, was present.  When a quorum was present

8    the Commission could act based on a majority vote.

9         Fifteen, pursuant to the Texas Open Meetings Act

10   codified in Texas Government Code Annotated Section 551, the

11   Commission as a city government in Texas was authorized to

12   conduct official business only after providing at least

13   72 hours of public notice of the time, place and subject

14   matter of the meeting.  Such meetings were generally require

15   to be open to the public with closed meetings and executive

16   sessions permitted only under narrowly drawn exceptions.

17        Sixteen, prior to May of 2008 the Commission was

18   comprised of a Mayor, a Mayor Pro Tem and three Commissioners

19   elected at large.  The Mayor Pro Tem was a Commissioner

20   selected by a majority vote of the Commissioners to assume the

21   Mayor's duty when the Mayor was absent.

22        Seventeen, starting in or about May 2008 the

23   Commission was comprised of six Commissioners elected from

24   single-member districts, a Mayor elected at large and a Mayor

25   Pro Tem selected in the same manner as prior to May 2008.

1          Eighteen, due to his long tenure on the Commission

2     and relationship to Arturo C. Cuellar, Jr., a prominent

3     politician in Hidalgo County, John F. Cuellar, exerted a

4     certain amount of power and influence on the Commission and

5     over other city officials.  John F. Cuellar was the *de facto*

6     leader of the Commission's majority voting block during the

7     vast majority of the charge of conspiracy.

8          The Weslaco Water Treatment Facilities.

9          Nineteen, in or about 2004 the Texas Commission on

10    Environmental Quality, "TCEQ," notified the City of Weslaco

11    that its water treatment facilities were in violation of Texas

12    environmental regulations.  The city's water treatment

13    facilities included the water treatment plant, the "WTP,"

14    which processed the city's potable water, and North Wastewater

15    Treatment Plant, the "NWWTP," and the South Wastewater

16    Treatment Plant, the "SWWTP," which together process the

17    city's waste water.

18         Twenty, in or about 2007 the Commission voted to

19    issue approximately 28 million in municipal bonds to finance

20    several infrastructure projects in the Weslaco area.  The two

21    largest and costliest projects to be paid for by the bond

22    funds were to rebuild the NWWTP and to perform repairs to the

23    WTP.

24         Twenty-one, in or about 2008 the Commission hired

25    Company A to act as the construction manager for the

1     infrastructure projects to be funded by the bond issuance.

2     Under the contract Company A would effectively select the

3     companies to perform the infrastructure work to be paid for

4     with the bond funds.

5          Twenty-two, in or about March 18, 2008, Company A

6     granted itself, subject to the approval of the Commission, the

7     contracts to rehabilitate the NWWTP and the WTP, the two

8     costliest projects to be completed using the 28 million in

9     municipal bond proceeds.

10          The conspiracy.

11          Twenty-three, from in or about March 2008 through in

12     or about December 2016 in the Southern District of Texas and

13     elsewhere the defendants, Ricardo Quintanilla, also known as

14     "Richard;" John F. Cuellar; Arturo C. Cuellar, Jr., also known

15     as "AC;" and Daniel J. Garcia, Lopez and Tafolla did knowingly

16     combine, conspire, confederate and agree together and with

17     others known and unknown to the Grand Jury to devise and

18     intended to devise a scheme, an artifice to defraud and

19     deprive by means of material false and fraudulent pretenses,

20     representations and promises and to transmit and cause to be

21     transmitted by means of wire communication in interstate

22     commerce any writings, signs, signals, pictures, and sounds

23     for the purpose of executing the scheme and artifice to

24     defraud and deprive; that is, to deprive the City of Weslaco,

25     the Weslaco City Commission and the citizens of Weslaco of

1    their right to the honest services of John F. Cuellar and

2    Tafolla through bribery, in violation of Title 18, United

3    States Code, Sections 1343 and 1346.

4                    The scheme to defraud.

5                    Twenty-four, from in or about March 2008 through in

6    or about December 2016 in the Southern District of Texas and

7    elsewhere the defendants, Quintanilla, John F. Cuellar, Arturo

8    C. Cuellar, Jr., Garcia, Lopez and Tafolla and others known

9    and unknown to the Grand Jury devised and intended to devise a

10   scheme and artifice to defraud and to deprive the City of

11   Weslaco, the Weslaco City Commission and the citizens of

12   Weslaco of their intangible right to the honest services of

13   John F. Cuellar and Tafolla, both elected officials through

14   bribery.

15                   The purpose of the conspiracy.

16                   Twenty-five, the purpose of the conspiracy included

17   but were not limited to the following:  Subsection A, for

18   John F. Cuellar to enrich himself by accepting bribes in

19   exchange for using his official position as a Weslaco City

20   Commissioner and to take official acts to benefit and help

21   Company A, Company B and Company C obtain millions of dollars

22   in contracts from the City of Weslaco.  Subsection B, for

23   Tafolla to enrich himself by accepting bribes in exchange for

24   using his official position as a Weslaco City Commissioner to

25   take official acts to benefit and help Company A, Company B

1   and Company C obtain millions of dollars in contracts from the

2   City of Weslaco.  Subsection C, for Arturo C. Cuellar, Jr. to

3   enrich himself by keeping a portion of the bribe funds paid to

4   him by Lopez and then paid the remainder of the bribe funds to

5   John F. Cuellar.  Subsection D, for Quintanilla to enrich

6   himself by keeping a portion of the bribe funds paid to him by

7   Lopez and then paid the remainder of the bribe funds to

8   Tafolla.  Subsection E, for Lopez to enrich himself by keeping

9   a portion of the bribe funds paid by Company B and Company C.

10  And Subsection F, for Garcia to help Arturo C. Cuellar, Jr.,

11  John F. Cuellar and Lopez to conceal the bribery and

12  conspiracy by laundering the bribes through his Interest Only

13  Lawyers Trust Account or IOLTA account.

14          Manner and means of the conspiracy.

15          Twenty-six, the manner and means by which the

16  defendants carried out the conspiracy included but were not

17  limited to the following:  Subsection A, Lopez accepted at

18  least approximately $4.1 million paid through Company B and

19  Company C in order to pay bribes to John F. Cuellar and

20  Tafolla through Arturo C. Cuellar, Jr. and Quintanilla,

21  respectively.

22          Subsection B, Arturo C. Cuellar, Quintanilla and

23  Lopez corruptly gave, offered and promised things of value to

24  John F. Cuellar and Tafolla, including hundreds of dollars in

25  cash in exchange for specific official action favorable to

1    Company A, Company B and Company C, including votes

2    authorizing multimillion dollar contracts for water treatment

3    facilities in the City of Weslaco.

4            THE COURT:  Pause for just a second.  There was

5    including hundreds of thousands dollars, not just hundreds

6    of --

7            MR. LOPEZ:  I apologize, Your Honor.

8            THE COURT:  You left out the thousands.

9            MR. LOPEZ:  Okay.  I apologize, Your Honor.

10            Subsection C, John F. Cuellar, Arturo C. Cuellar,

11    Jr., Quintanilla, Lopez and Tafolla and other co-conspirators

12    met at various locations in the Southern District of Texas and

13    elsewhere to discuss the official action that John F. Cuellar

14    and Tafolla should take to benefit Company A, Company B and

15    Company C, and to discuss the payment of bribes.

16            Subsection D, in order to conceal the scheme,

17    John F. Cuellar, Arturo C. Cuellar, Jr., Quintanilla, Lopez

18    and Tafolla took steps to anonymously funnel the bribe

19    payments to John F. Cuellar and Tafolla in a manner to avoid

20    detection that the payments came from Company B and Company C,

21    including the following:

22            Sub-subsection (i), Lopez received payments from

23    Company B and Company B, as well as payments from Company A,

24    that were passed through Company B and Company C for the

25    purpose of paying bribes to John F. Cuellar and Tafolla

1  disguised as consulting fees due to Lopez.

2          Sub-subsection (ii), from in or about March 26, 2008

3  to in or about November 24, 2014, Lopez wrote a total of

4  approximately $1,398,000 in checks to Arturo C. Cuellar, Jr.

5  drawn on Lopez's accounts at Lone Star National Bank.

6  Sub-subsection (iii), from on or about April 21, 2011 to on or

7  about November 6, 2014, Arturo C. Cuellar, Jr. directed

8  employees of Company B to make a total of approximately

9  $405,000 in payments to John F. Cuellar from Company B

10  disguised as payments for legitimate legal services.

11          Sub-subsection (iv), from on or about December 2012

12  to on or about April 2013, Arturo C. Cuellar, Jr., John F.

13  Cuellar and Daniel J. Garcia funneled at least approximately

14  $90,000 in bribe payments disguised as payments for legitimate

15  legal services through the IOLTA account for Garcia's law

16  firm.

17          Sub-subsection (v), from on or about December 2011

18  to on or about October 2014, Lopez wrote a total of

19  approximately $85,950 in checks to Quintanilla drawn on

20  Lopez's accounts at Lone Star National Bank.

21          Sub-subsection (vi), Quintanilla converted the

22  checks from Lopez to cash at Lone Star National Bank and

23  shared approximately half of the cash with Tafolla.

24          Subsection E:  John F. Cuellar and Tafolla cast

25  votes at the direction of Lopez, Arturo C. Cuellar, Jr.,

Quintanilla and their co-conspirators to award contracts and payments to Company A, Company B and Company C, or to benefit Company A, Company B and Company C in the execution and administration of their contracts with the city.

Subsection F, John F. Cuellar directed city officials to call special meetings of the Commission wherein votes could be taken to benefit Company A, Company B and Company C because special meetings were not publicized or recorded in the same way as regular Commission meetings and the short notice provided for special meetings prevented Commissioners who would not vote for John F. Cuellar from attending.

Subsection G, in or about 2016 Lopez, Quintanilla and their co-conspirators provided Tafolla with questions to ask of other city officials and which were intended to benefit Company B during a dispute between the City of Weslaco and Company B over the City of Weslaco's refusal to pay Company B's invoices for the WTP.

Subsection H, John F. Cuellar, Arturo C. Cuellar, Jr., Quintanilla, Lopez and Tafolla and their co-conspirators used wire communications and interstate commerce, such as mobile messaging applications, email and interstate bank transfers in furtherance of the scheme to defraud.

Overt acts.

Section 27, in furtherance of the conspiracy and in

order to accomplish its objections, John F. Cuellar, Arturo C. Cuellar, Jr., Quintanilla, Lopez and Tafolla and their co-conspirators committed the following overt acts, among others, in the Southern District of Texas and elsewhere.

Twenty-eight, in or about 2008, Person A and Person B agreed with Lopez that they would pay Lopez to ensure that Company A and Company B obtained the contracts for certain construction and engineering projects relating to the city's water treatment facilities.  Lopez agreed with Arturo C. Cuellar, Jr. and John F. Cuellar that John F. Cuellar would take official action as a Weslaco City Commissioner to benefit Company A and Company B, such as by voting to grant them contracts with the city in exchange for bribe payment.

Twenty-nine, in or about 2011 Lopez, with the knowledge of John F. Cuellar and Arturo C. Cuellar, Jr. obtained the agreement of Quintanilla to obtain the agreement of another Commissioner to accept bribes in exchange for the agreement to take official action as a Weslaco City Commissioner to benefit Company A and Company B such as by voting to grant them contracts with the city.  Quintanilla obtained the agreement of Tafolla to take official action as a Weslaco City Commissioner to benefit Company A and Company B such as by voting to grant them contracts with the city in exchange for bribe payments paid from Lopez through Quintanilla.

1        Thirty, in or about 2012 Person B recruited Person C
2   to funnel bribe payments to Lopez.  Person C agreed to do so
3   in exchange for the agreement that Company C would have
4   received subcontracts on the WTP and contracts with the City
5   of Weslaco.  John F. Cuellar and Tafolla agreed through Lopez,
6   Arturo C. Cuellar, Jr., and Quintanilla to take official
7   actions as a Weslaco City Commissioner to benefit Company C
8   such as by voting to grant the contracts with the city in
9   exchange for the bribe payments.
10       The Water Treatment Facilities:  The NWWTP.
11       Thirty-one, on or about March 25, 2008, John F.
12  Cuellar made a motion to grant the professional services
13  contract to Company A to perform engineering services to
14  rehabilitate the WTP and to construct a new NWWTP.  On the
15  same date John F. Cuellar voted in favor of that motion.
16       Thirty-two, in or about May 2008 in the absence of
17  Weslaco's Mayor John F. Cuellar executed a Professional
18  Services Agreement with Company A.
19       Thirty-three, on or about November 4, 2008 John F.
20  Cuellar made a motion to place additional projects under
21  Company A's contract.  On the same date John F. Cuellar voted
22  in favor of that motion.
23       Thirty-four, on or about August 18, 2009, John F.
24  Cuellar spoke against a motion to re-prioritize the 2007 bond
25  funds to shift money from the NWWTP to the WTP, the contracts

1     for both of which had been granted to Company A.  The effect

2     of the shifting of funds as proposed would have been to reduce

3     the total amount of money due to Company A under the contract.

4     On the same date, John F. Cuellar voted to oppose that motion,

5     instead asserting to the Commission that the NWWTP and the WTP

6     be given equal significance keeping the amount of money due to

7     Company A under the contract the same.  Despite John F.

8     Cuellar's vote, the motion carried.

9            Thirty-five, on or about September 1, 2009 John F.

10    Cuellar took the following action:

11           Subsection A, made a motion before the Commission to

12    suspend Robert's Rules of Order to allow the Commission to

13    reconsider John F. Cuellar's motion that the NWWTP and WTP be

14    considered with equal importance with regard to a portion of

15    the 2007 bond funds, an initiative that had been defeated at

16    the August 18, 2009 meeting.

17           Subsection B, voted in favor of the motion to

18    suspend Robert's Rules of Order to allow the Commission to

19    reconsider John F. Cuellar's motion that the NWWTP and WTP be

20    considered with equal importance with regard to a portion of

21    the 2007 bond funds.

22           Subsection C, made a motion before the Commission

23    that the NWWTP and WTP be considered with equal importance

24    with regard to a portion of the 2007 bond funds.

25           And, D, voted in favor of the motion that the NWWTP

1    and WTP be considered with equal importance with regard to a

2    portion of the 2007 bond funds.

3              The WTP.

4              Thirty-six, in or about 2011 John F. Cuellar advised

5    and pressured city staff to grant contracts to Company A and

6    Company B to design and construct a new WTP.

7              Thirty-seven, on or about January 18, 2011, John F.

8    Cuellar voted to authorize the City Manager and City Attorney

9    to negotiate a new Professional Services Agreement with

10   Company A to prepare a preliminary engineering report on the

11   WTP.

12             Thirty-eight, on or about August 16, 2011,

13   Subsection A, John F. Cuellar made a motion before the

14   Commission to approve the preliminary engineering report on

15   the WTP prepared by Company A.

16             Subsection B, John F. Cuellar and Tafolla voted to

17   approve the preliminary engineering report on the WTP prepared

18   by Company A.

19             And Subsection C, John F. Cuellar and Tafolla voted

20   to declare that the WTP was exceeding capacity in failing to

21   meet public water demand, thereby creating an imminent threat

22   to public health and safety.  This declaration allowed the

23   Commission to direct and grant the construction contracts to

24   address violations issued by the TCEQ, bypassing ordinary

25   bidding and qualification procedures.

1          Thirty-nine, on or about September 8, 2011, John F.
2     Cuellar and Tafolla took the following actions:
3          Subsection A, voted to authorize the City Manager to
4     negotiate a pre-construction services contract with Company A
5     for the WTP, and
6          Subsection B, voted in favor of a motion for the
7     City Manager to negotiate a contract with Company B for the
8     design of an expansion to the WTP and associated projects.
9          Due to the declaration from the August 16, 2011
10    meeting that the WTP represented an imminent threat to public
11    health and safety, the Commission was able to grant these
12    contracts without the ordinary competitive bidding and
13    qualification process.
14         Forty, on or about October 6, 2011, Tafolla voted to
15    approve a Professional Services Agreement with Company B for
16    the design of the WTP and the Professional Services Agreement
17    with Company A for the pre-construction services for the WTP.
18         Forty-one, on or about March 27 2012, John F.
19    Cuellar and Tafolla voted to authorize the Mayor to execute
20    the contract valued at approximately $38.5 million with
21    Company A for the expansion of the WTP and to authorize city
22    staff to amend the city budget to accommodate the $38.5
23    million contract with Company A.
24         Forty-two, on or about June 5, 2012, John F. Cuellar
25    and Tafolla voted to approve the City of Weslaco entering into

1    a Professional Services Agreement with Company C.

2              Forty-three, in or about 2012 Person A and Person B

3    told Lopez that they needed the Commission to approve an

4    amendment increasing the price of Company B's contract with

5    the city.  Person A and Person B told Lopez that the

6    additional funds from this amendment would enable Person B to

7    continue paying Lopez so that Lopez could in turn continue

8    paying others.

9              Forty-four, on or about September 20, 2012, John F.

10   Cuellar and Tafolla voted to approve an amendment to the

11   contract with Company B to include automation and daily

12   construction inspection in an amount not to exceed $2,978,950,

13   to authorize a budget amendment as appropriate, and to

14   authorize the Mayor to execute any related documents.

15             The SWWTP.

16             Forty-five, in or about 2013, John F. Cuellar

17   advised and pressured city staff, including the City Manager,

18   to grant contracts to Company B.

19             Forty-six, on or about July 16, 2013, John F.

20   Cuellar and Tafolla voted to amend the city's contract with

21   Company B to authorize Company B to prepare a preliminary

22   engineering report for the repairs to the SWWTP.

23             Forty-seven, on or about September 2, 2014, John F.

24   Cuellar and Tafolla voted to approve the final preliminary

25   engineering report for the SWWTP prepared by Company B and to

1       authorize a budget amendment to pay Company B for the report.

2               Forty-eight, John F. Cuellar and Tafolla made the

3       motions, cast the votes and took the other official actions

4       referenced in Paragraphs 28 through 47 in their official

5       capacities as Weslaco City Commissioners during Weslaco City

6       Commission meetings.

7               Other acts.

8               Forty-nine, John F. Cuellar, Arturo C. Cuellar, Jr.,

9       Quintanilla, Lopez, and Tafolla and their co-conspirators used

10      wire communications in interstate commerce such as mobile

11      messaging applications, email, and interstate bank transfers

12      in furtherance of their schemes to defraud.

13              Fifty, in or about February 2016, Lopez sent to

14      Quintanilla via electronic messages over a cellular phone

15      questions that Lopez wanted Tafolla to ask in the upcoming

16      City Commission meeting.  These questions were crafted to

17      benefit Company B in its attempts to recover payments for the

18      WTP from the City of Weslaco after the city stopped paying

19      Company B.

20              Fifty-one, on or about September 1, 2016, Lopez and

21      Person B discussed the money still owed to Lopez as part of

22      the bribery scheme and discussed how Person B would provide

23      the remaining funds to Lopez.

24              Bribe payments, payments to Lopez.

25              Fifty-two, in or about 2008, Company B began paying

1    Lopez approximately $17,000 per month.

2           Fifty-three, in or about February 2011 around the

3    time that John F. Cuellar voted to approve the Professional

4    Services Agreement with Company A to prepare a preliminary

5    engineering report on the WTP, Company B increased the amount

6    paid on a monthly basis to Lopez from approximately $17,000 to

7    approximately $25,000 to $40,000 per month.

8           Fifty-four, from in or about June 2012 to in or

9    about May 2014, Person B paid a total of approximately

10   $300,000 in four payments of approximately $75,000 each, to

11   Lopez under the under the pretense that Person B was leasing a

12   hunting property that belonged to Lopez.  In truth, these

13   reported lease payments were another way for Person B to pay

14   bribe money to Lopez.

15          Fifty-five, in all from in or about April 2008

16   through in or about December 2015, Person B and Company B paid

17   over approximately $2.5 million to Lopez in regular payments

18   of approximately $1,000 to approximately $75,000.

19          Fifty-six, on or about April 2012, shortly after

20   John F. Cuellar and Tafolla voted to authorize the Mayor to

21   execute $38.5 million contracts with Company A, Person C made

22   a payment of approximately $85,000 to Lopez.  From that point

23   forward Person C made payments ranging from approximately

24   $75,000 to approximately $150,000 to Lopez at various periods

25   throughout the year until approximately July of 2014.  From in

or about April 2012 to in or about July 2014, Company C paid over approximately $1.6 million to Lopez.

Payments to Arturo C. Cuellar, Jr.

Fifty-eight, Lopez shared the money he received from Company B and Company C with Arturo C. Cuellar, Jr. through monthly payments of approximately $5,000 to Arturo C. Cuellar, Jr. beginning at least by on or about March 26, 2008, so that Arturo C. Cuellar, Jr. could pay bribes to John F. Cuellar.

Fifty-nine, in or about May 2011 Lopez's monthly payments to Arturo C. Cuellar, Jr. increased ranging from approximately $10,000 to more than $60,000 approximately monthly.

Sixty, through these monthly payments from in or about March 2008 to in or about November of 2014, Lopez paid approximately $1,398,000 to Arturo C. Cuellar, Jr.

Payments to John F. Cuellar.

Sixty-one, in or about April 2011 Arturo C. Cuellar, Jr. directed employees of Company B to begin making semi-monthly payments of approximately $5,000 to $7,500 to John F. Cuellar despite the fact that John F. Cuellar, Jr. [sic] was not providing services to Company B.  Company B's employees complied.

Sixty-two, from in or about April 2011 to in or about November 2014, Arturo C. Cuellar, Jr. paid approximately $405,000 to John F. Cuellar through Company B in semi-monthly

1     payments ranging from approximately $5,000 to approximately

2     $7,500 disguised as payments for legal services that were

3     never rendered so that John F. Cuellar would take official

4     actions to benefit Company A, Company B and Company C.

5          Sixty-three, the payments from Lopez to Arturo C.

6     Cuellar, Jr. and the payments from Company B to John F.

7     Cuellar stopped promptly in November 2014 upon John F.

8     Cuellar's loss of his re-election bid for the Commission.

9          Payment of bribes to John F. Cuellar through Garcia.

10         Sixty-four, in or about December 2012, Garcia agreed

11    to assist Lopez and Arturo C. Cuellar, Jr. in providing

12    approximately $90,000 in bribe payments to John F. Cuellar

13    using Garcia's law practice and IOLTA account.  Lopez agreed

14    with Garcia then in exchange for Garcia's assistance in

15    providing bribe funds to John F. Cuellar, Lopez and Arturo C.

16    Cuellar, Jr. would help Person D, a friend of Garcia, obtain

17    employment.

18         Sixty-five, on or about December 18, 2012, Lopez

19    wrote Check No. 1109 from Lone Star National Bank account

20    number ending in 9303 to Garcia in the amount of $60,000 and

21    providing instructions for Garcia to pay those funds to

22    John F. Cuellar.

23         Sixty-six, on or about December 19, 2012 Garcia

24    deposited Check No. 1109 for $60,000 from Lopez into Lone Star

25    National Bank account number ending in 9362, one of Garcia's

1  IOLTA accounts.

2  Sixty-seven, on or about December 19, 2012, Garcia

3  wrote Check No. 1022 from Lone Star National Bank account

4  number ending in 9362, one of Garcia's IOLTA accounts, in the

5  amount of $40,000 to John F. Cuellar.

6  Sixty-eight, on or about December 19, 2012, Garcia

7  wrote Check No. 1184 from Bank of America account number

8  ending in 9717, one of Garcia's IOLTA accounts, in the amount

9  of $20,000 to John F. Cuellar.

10  Sixty-nine, on or about December 19, 2012, John F.

11  Cuellar deposited Check Nos. 1022 and 1184 from Lone Star

12  National Bank account number ending in 9362 and Bank of

13  America account number ending in 9717 in the amounts of

14  $40,000 and $20,000, respectively, into international bank

15  account number ending in 623.

16  Seventy, on or about January 29, 2013, Lopez wrote

17  Check No. 1228 from Lone Star Bank account number ending in

18  9303 to Garcia in the amount of $40,000 and provided

19  instructions for Garcia to pay those funds to John F. Cuellar.

20  Seventy-one, on or about January 30, 2013, Garcia

21  deposited Check No. 1228 from Lone Star National Bank account

22  number ending in 9303 into Lone Star National Bank account

23  number ending in 9362, one of Garcia's IOLTA accounts.

24  Seventy-two, on or about March 12, 2013, Garcia

25  wrote Check No. 1028 from Lone Star National Bank account

1    number ending in 9362, one of Garcia's IOLTA accounts, in the

2    amount of $15,000 to John F. Cuellar.

3            Seventy-three, on or about March 13, 2013, John F.

4    Cuellar deposited Check No. 1028 from Lone Star National Bank

5    account number ending in 9362 in the amount of $15,000 into

6    international bank account number ending in 623.

7            Seventy-four, on or about April 12, 2013, Garcia

8    wrote Check No. 1030 from Lone Star National Bank account

9    number ending in 9362, one of Garcia's IOLTA accounts, in the

10   amount of $15,000 to John F. Cuellar.

11           Seventy-five, on or about April 15, 2013, John F.

12   Cuellar deposited Check No. 1030 from Lone Star Bank -- Lone

13   Star National Bank account number ending in 9362 in the amount

14   of $15,000 into international bank account number ending in

15   623.

16           Seventy-six, in or about 2013, Lopez, Arturo C.

17   Cuellar, Jr., and Garcia discussed Garcia's payments to

18   John F. Cuellar using Garcia's IOLTA account.

19           Seventy-seven, in or about August 2014, Arturo C.

20   Cuellar, Jr. and John F. Cuellar helped Person D obtain

21   employment with the City of Weslaco in exchange for Garcia's

22   assistance in providing the bribe funds to John F. Cuellar.

23           Payments to Tafolla.

24           Seventy-eight, in or about 2011, Lopez began writing

25   checks to Quintanilla approximately once per month in amounts

1    ranging from approximately $500 to approximately $3,500.

2    Quintanilla cashed these checks and provided approximately

3    half of the cash to Tafolla.

4           Seventy-nine, from on or about September 15, 2011 to

5    in or about October 22, 2014, Lopez wrote approximately 41

6    checks drawn on Lone Star National Bank account numbers ending

7    in 9303, 5069, and 9214 to Quintanilla in the amount of

8    approximately $500 to approximately $5,000 each for a total

9    for $85,950 so that Quintanilla could make bribe payments to

10   Tafolla.  Quintanilla converted these checks to cash at a Lone

11   Star National Bank branch.

12          This all occurred in violation of Title 18, United

13   States Code, Sections 1343, 1346 and 1349.

14          THE COURT:  Thank you, Mr. Lopez.  You need probably

15   some oxygen now.

16          MR. LOPEZ:  A little bit.

17          THE COURT:  Mr. Cuellar, there is a lot there, but I

18   want to sort of break it down a little bit for you.  What

19   we're looking here in Count 1 is a conspiracy count and it's a

20   conspiracy count, and I'll get to that part in just a moment,

21   but it's basically a conspiracy count to violate the Wire

22   Fraud Honest Services Statute.  So let me address those --

23   that part first.   And that's -- and we reference here 1343

24   and 1346.

25          So basically as to that part, what the Government

1    would be required to prove basically is that you knowingly

2    devised or intended to devise any scheme to defraud.  Here it

3    would be to accept bribe payments in exchange for favorable

4    consideration to these companies.

5         That the scheme to defraud was employed through

6    false representations, that is that all of these awards,

7    contracts and benefits to these companies were being honestly

8    rendered, that in doing so you in some manner or another

9    transmitted or caused to be transmitted by wire communications

10   and that can include texts through your telephone and can

11   include email messages through the internet, it can also

12   include the use of the bank accounts here.  And all of this

13   was done with the intent to defraud here.

14        So that is the sort of underlying offense here.  Of

15   course as I said, this is a conspiracy charge.  A conspiracy

16   basically, Mr. Cuellar, is an agreement to do something that

17   is illegal.  In that regard what is required to be proven

18   regarding the conspiracy is that you and at least one other

19   person entered into this agreement.  It doesn't have to be a

20   specific or curious, the terms of our agreement.  You don't

21   have to have known every detail and you don't have to have

22   known everybody else involved in the agreement, so long as it

23   was you and at least one other person.

24        You have to have had known the unlawful purpose of

25   the agreement here, that is to accept bribes in exchange for

1    what would have otherwise been honest services, and that in

2    trying to accomplish that either you or at least one other

3    person that was part of the agreement committed one of these

4    overt acts that Mr. Lopez has gone through reading here.

5            So again, it's a conspiracy charge in Count 1 that

6    you have indicated you are going to plead to.

7            Do you understand the nature of the charge?

8            DEFENDANT CUELLAR:  Yes, Your Honor.

9            THE COURT:  Any questions at all about the charge?

10           DEFENDANT CUELLAR:  No, Your Honor.

11           THE COURT:  In connection with this charge,

12   Mr. Cuellar, you have the right to be represented by an

13   attorney as you are being represented here today.  You have

14   that right even if you cannot afford an attorney.

15           Do you understand this?

16           DEFENDANT CUELLAR:  Yes, Your Honor.

17           THE COURT:  You also have the right to enter a plea

18   of not guilty to the charge, as you did to begin with.  If you

19   wish to go forward with a plea of not guilty, you have the

20   right to have a jury trial.  The jury is made up of

21   12 citizens of this community and the jury would be the one to

22   decide whether you're guilty or not guilty.

23           In connection with a jury trial, you have the right

24   to have the Government present the witnesses that the

25   Government has to testify against you.  You have the right

1    through your attorney to cross-examine those witnesses.  You

2    have the right also to present witnesses of your own and to

3    compel them to be present to testify even if they do not wish

4    to do so.  And you of course have the right to testify if you

5    wish to do so, but you do not have to testify.  The fact that

6    you choose not to testify will not be considered by the jury

7    in making its decision as to whether you are guilty or not

8    guilty.

9            All of these are rights that you have if you wish to

10   go forward with a plea of not guilty.

11           Do you understand this?

12           DEFENDANT CUELLAR:  Yes, Your Honor.

13           THE COURT:  If you do wish to enter a plea of

14   guilty, you will be giving up your right to have a jury trial

15   because I, rather than the jury, will decide whether you are

16   guilty.  You will be giving up your right to have the

17   witnesses presented, both yours and the Government's, except

18   that you yourself will become a witness in the case.  By that

19   I mean that the Government's attorney will tell me the facts

20   of your case, I will ask you questions about those facts and

21   you will have to answer those questions for me, which of

22   course means that you give up your right to remain silent.

23           Do you understand this?

24           DEFENDANT CUELLAR:  Yes, Your Honor.

25           THE COURT:  With that understanding then do you wish

1       to give up the right to have a jury trial, the right to have

2       the witnesses presented?

3               Do you wish to give up those rights by entering a

4       plea of guilty?

5               DEFENDANT CUELLAR:  Yes, Your Honor.

6               THE COURT:  Have you spoken with your attorney about

7       what you may be facing by way of punishment if you are found

8       guilty in this case?

9               DEFENDANT CUELLAR:  Yes, Your Honor.

10              THE COURT:  For Count 1, this conspiracy charge, you

11      are facing up to 20 years of prison time.  There's no minimum

12      amount of time required but it is up to 20 years of prison

13      time.

14              Do you understand this?

15              DEFENDANT CUELLAR:  Yes, Your Honor.

16              THE COURT:  You are also facing a possible term of

17      three years of supervised released.  Basically supervised

18      release is a period of time after you have been released from

19      prison.  You are not in custody anymore, but you are still

20      kept under Court supervision, very much like you are right now

21      out on bond.  The difference being that when you are under

22      Court supervision any violation of your terms of supervised

23      release could result in you having to serve more prison time

24      for this offense, even if that violation is not a new offense.

25              Do you understand this also?

1          DEFENDANT CUELLAR:  Yes, Your Honor.

2          THE COURT:  The law also provides that you can be

3   ordered to pay a fine of up to $250,000.  All right.  This is

4   one where it's restitution.

5          That restitution amount is as to the amount or?

6          MR. LOPEZ:  The restitution, that's a matter to be

7   decided by the Court, Your Honor.

8          THE COURT:  But the restitution is just whatever the

9   amount is.  Correct?  There's no --

10          MR. LOPEZ:  That's correct.

11          THE COURT:   -- okay, additional.

12          So first of all, there is a possible fine as I was

13   just mentioning of $250,000.  That does depend on your ability

14   to pay.  There is also a $100 that does not depend on your

15   ability to pay called a "special assessment" that you will be

16   ordered to pay.  And then as I just mentioned, there is also a

17   possible restitution in this case that you would be asked --

18   ordered to make whole, in this case it would be the City, for

19   any losses that it suffered as a result of the criminal

20   conduct.

21          Do you understand all of that?

22          DEFENDANT CUELLAR:  Yes, Your Honor.

23          THE COURT:  That is the law that applies to the

24   penalties you are facing for Count 1.  The Court in deciding

25   the actual sentence that it will impose considers something

1    that we call the "Guidelines."

2              Did you talk with Mr. Montalvo about the Guidelines?

3              DEFENDANT CUELLAR:  Yes, Your Honor.

4              THE COURT:  The Guidelines are somewhat different

5    from the law, even though the Guidelines is also a law.  It is

6    different in that I have to consider the guidelines, but I do

7    not have to follow the Guidelines.  What I mean by that is

8    that at the time of sentencing I will consider all the

9    information presented to me when I hear your case, I will

10   consider the Guidelines that apply to your case including the

11   guideline range that we determine is the applicable guideline

12   range, and I will consider the law that applies to sentencing.

13             I will then decide what sentence you should receive.

14   That sentence can be within your guideline range, it could be

15   less than your guideline range, or it could be more than your

16   guideline range, provided I do not sentence you to more than

17   the statutory maximum sentence of 20 years of prison time,

18   three years of supervised release or no more than the $250,000

19   fine.

20             Do you understand the estimate guidelines?  As I

21   said, I have to consider them, but I do not have to follow

22   them.

23             DEFENDANT CUELLAR:  Yes, Your Honor.

24             THE COURT:  It is also important that you understand

25   that while I expect Mr. Montalvo to have given you a guideline

1    range that he believes will apply to this case, that is not a
2    promise or a guarantee.  I will be the one to determine what
3    the correct guideline range is.  I do not do that until the
4    time of sentencing.  So whatever range he has come up with, it
5    could turn out to be different at the time of sentencing.
6            Do you also understand this?
7            DEFENDANT CUELLAR:  Yes, Your Honor.
8            THE COURT:  Does the Indictment have any kind notice
9    of forfeiture?  Yes.  Okay.
10           All right.  Also, Mr. Cuellar, the Government in the
11   Indictment has given you a notice of forfeiture which
12   basically means that the Government has put you on notice that
13   it will -- that it intends to seek any property, whether it's
14   money or other property, that is derived from this offense.
15   In any case where you have been given notice that the
16   Government intends to take property that you may have an
17   interest in, you of course have certain rights.  Those rights
18   can be asserted in a criminal proceeding such as this, or
19   separately through an administrative proceeding.
20           Now I suspect there may be an agreement here about
21   the waiver of rights, but first of all I want to make sure
22   that you understand that you have been given notice of
23   forfeiture.
24           Do you understand that?
25           DEFENDANT CUELLAR:  Yes, Your Honor.

1          THE COURT:  Do you also understand that you do have

2     certain rights in connection with that notice?

3          DEFENDANT CUELLAR:  Yes, Your Honor.

4          THE COURT:  Do you have any questions about anything

5     that we have covered here, Mr. Cuellar?

6          DEFENDANT CUELLAR:  No.

7          THE COURT:  Have you understood everything we've

8     covered?

9          DEFENDANT CUELLAR:  Yes, Your Honor.

10          THE COURT:  Is there a plea agreement as to

11    Mr. Cuellar?

12          MR. LOPEZ:  Yes, Your Honor, there is a plea

13    agreement, and it reads in pertinent part that Defendant

14    agrees to plead guilty to Count 1 of the Indictment and

15    pursuant to Title 18, United States Code, Section 3663,

16    Subsection (a)(3), the Defendant agrees and stipulates that at

17    least $405,000 comprises the proceeds the Defendant obtained

18    directly or indirectly as a result of his participation in the

19    charged violation, and that the factual basis for his guilty

20    plea supports the forfeiture of $405,000.

21          Defendant agrees to forfeit any of the Defendant's

22    property in substitution up to a total forfeiture of $405,000.

23    And further, the Defendant agrees to the imposition of a

24    personal money judgment up to that amount, and the Defendant

25    agrees to make a complete financial disclosure by truthfully

1   executing a sworn financial statement, a Form OBD-500, or

2   similar form within 14 days, and by authorizing the release of

3   all financial information requested by the United States.

4          Defendant agrees to authorize release of all

5   financial information requested by the United States and to

6   take all steps necessary to pass through title to forfeitable

7   assets to the United States and to fully assist in the

8   collection of restitution in kind, including but not limited

9   to surrendering title, executing warranty deeds, signing

10  consent decrees, and signing any other documents to effectuate

11  the transfer of any asset.

12         In exchange, the Government will recommend that the

13  offense level decrease by two levels pursuant to United States

14  Sentencing Guideline Section 3D1.1A if the Defendant clearly

15  demonstrates acceptance of responsibility that the remaining

16  counts of the Indictment be dismissed at the time of

17  sentencing.

18         And, Your Honor, we also have a unopposed Motion for

19  the Imposition of a Money Judgment in connection with the plea

20  agreement.

21         THE COURT:  All right.  Thank you.

22         Mr. Cuellar, the Government indicates you have

23  signed the plea agreement, I believe Mr. Montalvo's showing

24  that to you.

25         Can you confirm that you did, in fact, sign the plea

1    agreement?

2              DEFENDANT CUELLAR:  Yes, Your Honor.

3              THE COURT:  And did you review that agreement with

4    your attorney before you signed it?

5              DEFENDANT CUELLAR:  Yes, Your Honor.

6              THE COURT:  Okay.  I prefer to have the one that

7    Mr. Cuellar just reviewed.

8              MR. LOPEZ:  Yes, I apologize for that, Your Honor.

9         (Pause in the proceedings.)

10             THE COURT:  All right.  Mr. Cuellar, the Government

11   has summarized the plea agreement, and I'll try to summarize

12   it even further, but basically the agreement is that you will

13   enter a plea of guilty to Count 1.  In exchange -- and

14   additionally that you agree basically to a forfeiture amount

15   and money judgment amount of $405,000, and to give up any and

16   all rights regarding this money judgment and forfeiture issue

17   as well, and that in exchange for that the Government will

18   recommend two levels off for acceptance of responsibility, and

19   then dismiss the other counts in the Indictment.

20             Is that what you understand your agreement with the

21   Government to be?

22             DEFENDANT CUELLAR:  Yes, Your Honor.

23             MR. LOPEZ:  And, Your Honor, in just looking at my

24   notes, I don't know if missed it or anything, but there was

25   just one admonishment, that the guidelines be advisory, that

1    the Court could sentence him to any range within the statutory

2    requirements.

3              THE COURT:  I did cover that.  No, I did cover that.

4              Okay.  I am going to ask, in light of the fact that

5    the second page here does not have any kind of heading, or if

6    counsel and Mr. Cuellar would initial the second page on that

7    as well?  It's just it isn't linked directly to anything.

8              Just initial at the bottom or somewhere on there, it

9    doesn't matter to the Court.

10         (Pause in the proceedings.)

11             THE COURT:  Mr. Cuellar, the agreement that you have

12   made with the Government is only between you and the

13   Government.  It is not an agreement with the Court.  By that I

14   mean that if you do enter a plea of guilty and the Court finds

15   you guilty, the case will be set for sentencing.  At the time

16   of sentencing I will consider the recommendations made to me

17   by the Government.  I will also consider the agreement

18   regarding the amount here.

19             But I do not have to follow either the

20   recommendation or that agreement regarding the amount, and

21   even if I do not do so, I do not have to allow you to withdraw

22   your plea of guilty.

23             Do you understand that?

24             DEFENDANT CUELLAR:  Yes, Your Honor.

25             THE COURT:  Okay.  And I want to sort of now go a

1    little bit more into the reference regarding the amount

2    involved here.  The Probation Department will conduct a full

3    investigation into this case for purposes of sentencing.  Part

4    of what they do is they determine independently if whatever

5    you and the Government have agreed to as to what the amount

6    is.

7          You know, that report comes to me in time, I review

8    all of that, too, and I determine whether the amount set out

9    in the Presentence Investigation Report is the correct amount,

10   whether or not that corresponds to the amount that you and the

11   Government have agreed to.  If I find that it is more than

12   what you and the Government have agreed to, I could still

13   order you to pay more than what you and the Government have

14   agreed to.  And again, I wouldn't have to allow you to

15   withdraw your plea of guilty.

16          Do you understand this?

17          DEFENDANT CUELLAR:  Yes, Your Honor.

18          THE COURT:  Also if I do find that the amount is

19   more than what you and the Government have agreed to,

20   depending on how Mr. Montalvo came up with the guideline range

21   that he thinks would apply, it could affect that guideline

22   range.  So again, the amount can make more than just a

23   difference regarding what you're ultimately ordered to pay.

24   It could make a difference regarding where you fall in the

25   guidelines.  And again, even if it turns out to be different,

1    I still don't have to allow you withdraw your plea of guilty.

2              Do you understand this?

3              DEFENDANT CUELLAR:  Yes, Your Honor.

4              MR. LOPEZ:  Your Honor, and just for clarification

5    purposes, we agreed to an amount of forfeiture, we have not

6    made any agreements to the amount of restitution.

7              THE COURT:  No, and I was just referencing -- in

8    case Mr. Montalvo was using this amount for guideline

9    calculations.

10             MR. MONTALVO:  Understood, Your Honor.  We're here.

11             THE COURT:  All right.  Okay.  Mr. Cuellar, other

12   than the agreements as set out in the -- and I guess the

13   unopposed Motion for Imposition of Money Judgment is part of

14   the agreement here.  So I touched on you've agreed to give

15   any -- up any and all rights and cooperate, which would

16   include the Motion for Imposition of Money Judgment.

17             Do you also understand that?

18             DEFENDANT CUELLAR:  Yes, Your Honor.

19             THE COURT:  And other than the agreements reflected

20   in the plea agreement, including the Motion of Entry of Money

21   Judgment, Mr. Cuellar, do you believe that there have been any

22   promises of any sort made to you by anybody, whether it be the

23   Government, your attorney or anybody else, to get you to plead

24   guilty?

25             DEFENDANT CUELLAR:  No, Your Honor.

1          THE COURT:  Has anybody threatened you or tried to

2     force you or coerce you into entering a plea of guilty?

3          DEFENDANT CUELLAR:  No, Your Honor.

4          THE COURT:  Do you wish to enter a plea of guilty

5     freely and voluntarily?

6          DEFENDANT CUELLAR:  Yes, Your Honor.

7          THE COURT:  And do you wish to do so because you

8     are, in fact, guilty as charged in Count 1 of the Indictment?

9          DEFENDANT CUELLAR:  Yes, Your Honor.

10          THE COURT:  The next part here, Mr. Cuellar, is

11     where the Government will tell me the facts of your case.

12     Please listen carefully and there's going to be a lot of

13     language that is somewhat similar to the Indictment, you

14     should listen to that, but in particular listen to the facts.

15          But before we get to that part, the critical

16     question then, Mr. Cuellar, as to Count 1 how do you plead,

17     guilty or not guilty?

18          DEFENDANT CUELLAR:  Guilty.

19          THE COURT:  Okay.  Now I want to hear the facts from

20     the Government.

21          MR. LOPEZ:  The Defendant agrees that the following

22     statement of facts fairly and accurately describe the

23     Defendant's actions involving the offense to which the

24     Defendant is pleading guilty.  The Defendant knowingly and

25     voluntarily and truthfully admits the facts set forth in the

1    statement of facts, the statement of facts and the stipulation

2    of facts for purposes of Section 1B1.2A of the United States

3    Sentencing Guidelines and related policy statements.  The

4    Defendant agrees that all the information contained within the

5    statement of facts constitutes relevant conduct for purposes

6    of sentencing within the meaning of Section 1D1.3 and may be

7    used in determining the applicable sentencing guidelines

8    range.

9         At all relevant times the City of Weslaco was a

10   political subdivision within the State of Texas.  Weslaco is

11   governed by a local government, pursuant to the Charter of the

12   City of Weslaco.  The Defendant is an attorney and former City

13   of Weslaco Commissioner who served as a Commissioner from at

14   least 1995 through November 2014.  For large parts of his

15   tenure on the Weslaco City Commission, also known as the

16   "Commission," including from at least June 2007 to May 2009

17   and from May 2010 to November 2014 the Defendant was selected

18   by the Commission to serve as Mayor Pro Tem.  As a

19   Commissioner, the Defendant was an agent of the City of

20   Weslaco.

21        Ricardo Quintanilla is a businessman who lived and

22   worked in Weslaco, Texas.  AC Cuellar is a resident of

23   Progreso Lake, Texas who served as a Commissioner of Hidalgo

24   County, Texas from March 2010 to November 2010 and

25   approximately January 2013 to December 2016.

1          Daniel J. Garcia is an attorney based in Rio Grande
2     City, Texas who served on the Rio Grande City Consolidated
3     Independent School District Board of Trustees.
4          Leonel, Leo, Lopez is resident of Starr County,
5     Texas.
6          Gerardo "Jerry" Tafolla is a resident of Weslaco,
7     Texas who formerly served as a City of Weslaco Commissioner
8     from at least 2009 through 2019.
9          Company A was an international engineering and
10    construction company that performed large scale infrastructure
11    projects for public and private clients.
12         Company B was an engineering company based in San
13    Antonio, Texas.  Person B was the owner of Company B.
14         Company C was an engineering company based in
15    McAllen, Texas.  Person C was the owner of Company C.
16         Company D is a concrete company based in Corpus
17    Christi, Texas.  It is owned in part by Individual A.  Person
18    D was an attorney based in Houston, Texas.
19         The Texas Constitution and the laws of the State of
20    Texas under the Charter of the City of Weslaco establish
21    ethical standards of conduct for elected public officials
22    including the Weslaco City Commissioners.  The standards
23    included an oath to faithfully execute the duties of the
24    office of the Commissioner and to preserve, protect and defend
25    the Constitution and laws of the United States and of the

State of Texas.

Accordingly, Weslaco City Commissioners owed a fiduciary duty to the City of Weslaco, the Weslaco City Commission, and to the people of the City of Weslaco. As a public official in the Weslaco city government, the Defendant owed a fiduciary duty to the City of Weslaco and to its citizens to perform the duties and responsibilities of his office free from corrupt influence. As an elected official in the State of Texas, the Defendant swore to uphold the United States Constitution, the Texas Constitution and the laws of the State of Texas, and to faithfully execute the duties of his office.

In or about 2004, the Texas Commission on Environmental Quality, also known as "TCEQ," notified the City of Weslaco that it's water treatment facilities were in violation of the applicable environmental regulations. The city's water treatment facilities include the water treatment plant which process the city's potable water and the North Wastewater Treatment Plant and the South Wastewater Treatment Plant.

In or about 2007, the Commission voted to issue approximately 28 million in municipal bonds to finance several infrastructure projects in the Weslaco area. The two largest and costliest projects to be paid for with the bonds funds were to build a North Wastewater Treatment Plant and to

1    perform repairs to the Water Treatment Plant.  In or about
2    2008, the Commission hired Company A to act as the
3    construction manager for the infrastructure project to be
4    funded by the bond issuance.
5          Under the contract Company A would effectively
6    select the companies to perform the infrastructure work to be
7    paid for with the bond funds.
8          From in or about March 2008 to in or about December
9    2016 in the Southern District of Texas and elsewhere
10   Defendants knowingly devised and intended to devise a scheme
11   to defraud and to deprive the City of Weslaco, the Weslaco
12   City Commission and the citizens of Weslaco of their
13   intangible right to honest services through soliciting and
14   accepting bribes.  The Defendant formed this agreement with AC
15   Cuellar, Jr., Garcia, Lopez and others.
16         As part of the scheme the Defendant took and agreed
17   to take a variety of official actions to benefit and help
18   Companies A, B and C obtain millions of dollars in contracts
19   from the City of Weslaco.  In exchange for the bribes
20   Defendant voted in favor of infrastructure projects related to
21   Weslaco's water processing facilities and steered over $50
22   million in contracts to Companies A, B and C.
23         For example, on or about March 25, 2008, the
24   Defendant made a motion to grant a professional services
25   contract to Company A to perform engineering services to

rehabilitate the Water Treatment Plant and to construct a new North Wastewater Treatment Plant.  On the same day the Defendant voted in favor of that motion.  In or about May 2008, in the absence of Weslaco's Mayor, the Defendant executed a Professional Services Agreement with Company A.  On or about November 4, 2008, the Defendant made a motion to place additional projects under Company A's contract.  On the same date the Defendant voted in favor of that motion.

On or about March 17, 2009, the Defendant spoke against the motion to re-prioritize the 2007 bond funds to shift money from the North Wastewater Treatment Plant to the Water Treatment Plant.  The contracts for both of which had been granted to Company A.  The effect of shifting the funds as proposed would have been to reduce the total amount of money due to Company A under the contract.

On the same date the Defendant voted to oppose that motion, instead asserting that the Commission -- asserting to the Commission that the North Wastewater Treatment Plant and the Water Treatment Plant be given equal significance, keeping the same amount of money due to Company A under the contracts the same.  Despite the Defendant's vote, the motion carried.

On or about September 1, 2009 the Defendant made a motion before the Commission to suspend Robert's Rules of Order to allow the Commission to reconsider the Defendant's motion that the North Wastewater Treatment Plant and Water

1    Treatment Plant be considered with equal importance with

2    regard to apportioning the 2007 bond funds, an initiative that

3    had been defeated at the August 18, 2009 meeting.  He voted in

4    favor of the motion to suspend Robert's Rules of Order to

5    allow the Commission to reconsider the Defendant's motion that

6    the North Wastewater Treatment Plant and Water Treatment Plant

7    be considered with equal importance with regard to

8    apportioning the 2007 bond funds.

9         He made a motion before the Commission that the

10   North Wastewater Treatment Plant and Water Treatment Plant be

11   considered with equal importance with regard to apportioning

12   the 2007 bond funds, and voted in favor of the motion that the

13   North Wastewater Treatment Plant and Water Treatment Plant be

14   considered with equal importance with regard to apportioning

15   the 2007 bond funds.

16        In or about 2011, the Defendant supported the

17   granting of no-bid contracts to Company A and Company B to

18   design and construct a new Water Treatment Plant.

19        On or about January 18, 2011, the Defendant voted to

20   authorize the City Manager and City Attorney to negotiate a

21   new Professional Services Agreement with Company A to prepare

22   a preliminary engineering report on the Water Treatment Plant.

23        On or about August 16, 2011, the Defendant made a

24   motion before the Commission to approve the preliminary

25   engineering report on the Water Treatment Plant prepared by

1       Company A.  He also voted to approve the preliminary

2       engineering report on the Water Treatment Plant prepared by

3       Company A and also voted to declare that the Water Treatment

4       Plant was exceeding capacity and failing to meet public water

5       demand, thereby creating an imminent threat to public health

6       and safety.  This declaration allowed th Commission to

7       directly grant construction contracts to address violations

8       issued by the TCEQ and bypass ordinary bidding and

9       qualification procedures.

10              On or about September 8, 2011, the Defendant voted

11      to authorize the City Manager to negotiate a pre-construction

12      services contract with Company A for the Water Treatment Plant

13      and voted in favor of a motion for the City Manager to

14      negotiate a contract with Company B for the design of an

15      expansion to the Water Treatment Plant and associated

16      projects.

17              Due to the declaration from the August 16, 2011

18      meeting that the Water Treatment Plant presented an imminent

19      threat to public health and safety, the Commission was able to

20      grant these contracts without the ordinary competitive bidding

21      and qualification process.

22              On or about March 27, 2012 the Defendant voted to

23      authorize the Mayor to execute contracts valued at

24      approximately $38.5 million with Company A for the expansion

25      of the Water Treatment Plant and to authorize city staff to

1    amend the city's budget to accommodate the $38.5 million

2    contact with Company A.

3          On or about June 5, 2012, the Defendant voted to

4    approve the City of Weslaco entering into a Professional

5    Services Agreement with Company C.

6          On or about September 20, 2012, the Defendant voted

7    to approve an amendment to the contract with Company B to

8    include automation and daily construction inspections in an

9    amount not to exceed $2,978,950, to authorize a budget

10   amendment as appropriate and to authorize the Mayor to execute

11   any related documents.

12         In or about 2013, the Defendant supported the

13   granting of contracts to Company B, knowing and intending that

14   his support would form the basis for city staff decisions and

15   official acts regarding the granting of such contracts.

16         On or about July 16, 2013, the Defendant voted to

17   amend the city's contract with Company B, to authorize

18   Company B to prepare a preliminary engineering report for

19   repairs to the South Wastewater Treatment Plant.

20         On or about September 2, 2014, the Defendant voted

21   to approve the final preliminary engineering report for the

22   South Wastewater Treatment Plant prepared by Company B and to

23   authorize a budget amendment to pay Company B for the report.

24         At various times special meetings of the Commission

25   were called where votes could be taken to benefit Companies A,

1    B and C because special meetings were not publicized or

2    recorded in the same -- the special meetings were not

3    publicized or recorded in the same way as regular Commission

4    meeting.

5         The Defendant took these official actions in an

6    effort to enrich himself by accepting approximately $405,000

7    in bribes.  The Defendant understood that Lopez, AC Cuellar

8    and others were providing him with the bribes in order to

9    influence him in the performance of his official actions.

10        The Defendant met with his co-conspirators at

11   various locations in the Southern District and elsewhere to

12   discuss official actions the Defendant should take to benefit

13   Companies A, B and C and to discuss the payment of bribes.

14   To conceal the scheme the Defendant and his co-conspirators

15   took steps to anonymously funnel the bribe payments to the

16   Defendant, in a manner to avoid detection the payments came

17   from Companies B and C.

18        From on or about April 21, 2011, to on or about

19   November 6, 2014 the Defendant received approximately $405,000

20   in bribe payments funneled through Company D disguised as

21   payments for legal services that were never actually rendered.

22   These semi-monthly payments ranged from approximately $5,000

23   to approximately $7,000.  These payments were made so that the

24   Defendant would take official actions to benefit Companies A,

25   B and C.

1          The payments from Company D to the Defendant stopped

2     promptly in November 2014 upon the Defendant's loss of his re-

3     election bid for the Weslaco City Commission.

4          From on or about December 2012 to on or about April

5     2013, the Defendant, AC Cuellar, Jr., Lopez and Garcia

6     funneled at least approximately $90,000 in bribe payments

7     disguised as payments for legitimate legal services through

8     the IOLTA account for Garcia's law firm.   In exchange for

9     Garcia's participation the Defendant agreed to help Person D,

10    a friend of Garcia, obtain employment.

11         The Defendant and his co-conspirators used wire

12    communications and interstate commerce such as mobile

13    messaging applications, email and interstate bank transfers as

14    previously referenced in furtherance of this scheme to

15    defraud.

16         The preceding statement of facts is a summary made

17    for the purpose of providing the Court with the factual basis

18    for the Defendant's plea.   It does not include all the facts

19    known to the Defendant concerning criminal activity in which

20    he and others are engaged, nor does it contain all the facts

21    that the United States could have proven at trial against the

22    Defendant, or any of his co-conspirators.   The defense and the

23    Government reserve the right to present argument concerning

24    these agreed upon facts at a sentencing hearing.

25         THE COURT:  Mr. Cuellar, do you agree with what the

1    Government has stated?

2              DEFENDANT CUELLAR:  Yes, Your Honor.

3              THE COURT:  Is there anything that you believe is

4    not correct?

5              DEFENDANT CUELLAR:  No, Your Honor.

6              THE COURT:  Okay.  I'm going to ask just a few very

7    basic questions here, but I think it's very well covered.

8              But first of all, Mr. Cuellar, you do admit that all

9    the acts that have been referenced here in which you were

10   involved were in your position as a Commissioner for the City

11   of Weslaco; is that correct?

12             DEFENDANT CUELLAR:  Yes.

13             THE COURT:  And you also agree that in exchange for

14   many of these actions that you took, whether or not they were

15   successful, that you received the monies referenced by the

16   Government both in the Indictment and in the factual basis

17   here?

18             DEFENDANT CUELLAR:  Yes, Your Honor.

19             THE COURT:  Okay.  And do you also agree that this

20   conduct that you engaged in basically to accept bribes in

21   exchange for favorable rulings and actions for these various

22   companies here were all done in your position as a City of

23   Weslaco Commissioner?

24             DEFENDANT CUELLAR:  Yes, Your Honor.

25             THE COURT:  And that all of this was being done by

1    agreement with either the co-defendants named here or with

2    others.  Is that also correct?

3             DEFENDANT CUELLAR:  Yes, Your Honor.

4             THE COURT:  And that all of this was being done with

5    the intent to bring about the offense of basically the bribery

6    in exchange for the favorable consideration to these

7    companies?

8             DEFENDANT CUELLAR:  Yes, Your Honor.

9             THE COURT:  Thank you, Mr. Cuellar.

10            The Court does find that you are competent to enter

11   a plea, that you understand the nature of the charges against

12   you, as well as the consequences of entering a plea, that you

13   are entering a plea of guilty freely and voluntarily and that

14   there is a factual basis for the plea of guilty.  The Court

15   does find you guilty as charged in Count 1 of the Indictment.

16            Your case is set for sentencing on October 22 at

17   2:00 p.m. with a presentence investigation to be done and a

18   report to be completed by September 6, objections to be filed

19   by the 20th, with the final report due on October 4.

20            Now I now there may be some reason for delay down

21   the road for this, but obviously as soon as counsel from -- on

22   either side thinks that that may be the case, file your motion

23   with the Court and we'll certainly consider that.

24            MR. MONTALVO:  Yes, Your Honor.

25            THE COURT:  And Mr. Cuellar has been out on bond.

1    Is there any objection from the Government?

2            MR. LOPEZ:  There's no objection, Your Honor, but

3    may we approach to say something on the Record about the

4    witness?

5            THE COURT:  Yes, you may.

6            Okay.  All step forward, please.

7        (Bench conference from 11:10:25 to 11:11:38 was sealed by

8    the Court and not transcribed herein.)

9            THE COURT:  Regarding Mr. Cuellar's release, the

10   Court, Mr. Cuellar, will allow you to continue out on bond

11   under the same terms and conditions that had been previously

12   imposed.  Of course you must make sure to continue complying

13   with those terms and conditions and you must report for your

14   sentencing date right now as I have given it to you.  If that

15   changes, obviously Mr. Montalvo will let you know.  But it is

16   an offense to fail to report for a court-ordered sentencing

17   date.

18           Okay.  Also one question regarding the motion for

19   money judgment.  It's been presented to the Court already.

20   Is -- are counsel asking for the entry of that money judgment

21   now or --

22           MR. LOPEZ:  Yes.

23           THE COURT:   -- at sentencing?

24           MR. LOPEZ:  Yes, Your Honor, we asking for a

25   preliminary order.

1              THE COURT:  All right.

2              MR. MONTALVO:  No objection, Your Honor.

3              THE COURT:  Okay.  The Court will -- then will grant

4     that motion.

5              Okay.  Anything else at this time?

6              MR. LOPEZ:  Nothing further from the Government,

7     Your Honor.

8              MR. MONTALVO:  Your Honor, and I don't know if the

9     Court would prefer this in a written motion, but requesting it

10    orally now.  My client is requesting permission to -- again,

11    to travel to the Western District so he can visit with his

12    family in San Antonio.  I know the Court had given it to him

13    before, but if the Court prefers a written order --

14             THE COURT:  I do prefer a written.  I assume it's

15    not like today, correct?

16             MR. MONTALVO:  No, Judge, I'll file it today.

17             THE COURT:  Yes, a written motion is best.

18             MR. MONTALVO:  Yes, Your Honor.  Thank you.

19             THE COURT:  All right.  Anything else at this time

20    then?

21             MR. MONTALVO:  No, Your Honor.

22             MR. LOPEZ:  Nothing further from the --

23             THE COURT:  All right.

24             MR. LOPEZ:   -- Government, Your Honor.

25             THE COURT:  Thank you.  Then you may be excused.

1          COURT SECURITY OFFICER:  All rise.

2          (Proceedings adjourned at 11:13 a.m.)

3                          * * * * *

4          *I certify that the foregoing is a correct transcript*

5     *to the best of my ability produced from the electronic sound*

6     *recording of the proceedings in the above-entitled matter.*

7          */S./ MARY D. HENRY*

8     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

9     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

10    *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

11    *JTT TRANSCRIPT #60664*

12    *DATE FILED:  AUGUST 3, 2019*

13

14

15

16

17

18

19

20

21

22

23

24

25