IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 7:19-CR-00522 |
| | § | McALLEN, TEXAS |
| VERSUS | § | |
| | § | WEDNESDAY, |
| RICARDO QUINTANILLA | § | JANUARY 18, 2023 |
| ARTURO C. CUELLAR | § | |
| JOHN F. CUELLAR | § | 2:00 P.M. TO 4:09 P.M. |

**<u>SENTENCING HEARING</u>**

BEFORE THE HONORABLE MICAELA ALVAREZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:                    SEE NEXT PAGE

COURTROOM ERO:                  STEPHANIE GARCIA

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:


FOR THE UNITED STATES OF            US DEPARTMENT OF JUSTICE
AMERICA:                            William J. Gullotta, Esq.
                                    950 Pennsylvania Avenue NW
                                    Washington DC 20530
                                    202-514-2000


FOR DEFENDANT RICARDO               PEÑA ALECZANDER
QUINTANILLA:                        Jaime Peña, Esq.
                                    Michael Saldaña, Esq.
                                    3900 N. 10th Street
                                    Suite 1050
                                    McAllen, TX 78501
                                    956-948-2221


FOR DEFENDANT JOHN F.               LAW OFC OF RICK MONTALVO, PLLC
CUELLAR:                            Ricardo Montalvo, Esq.
                                    7017 N. 10th Street
                                    Suite N2-329
                                    McAllen, TX 78504
                                    956-594-4007


FOR DEFENDANT ARTURO C.             ATTORNEY AT LAW
CUELLAR, JR.:                       Carlos A. Garcia, Esq.
                                    1305 E. Griffin Parkway
                                    Mission, TX 78572
                                    956-584-1448

                                    GOLDSTEIN & ORR
                                    Cynthia H. Orr, Esq.
                                    Gerald H. Goldstein, Esq.
                                    310 S. St. Mary's Street
                                    San Antonio, TX 78205
                                    210-226-1463


ALSO PRESENT:                       Erika Martinez, USPO

1       **McALLEN, TEXAS; WEDNESDAY, JANUARY 18, 2023; 2:00 P.M.**

2       THE COURT:  Good afternoon.  You may be seated.

3       This is Case Number 19-522, the United States versus

4 Ricardo Quintanilla, John Cuellar and Arturo Cuellar.

5       Announcements, please.

6       MR. GULLOTTA:  Good afternoon, Your Honor.  Bill

7 Gullotta on behalf of the United States.

8       MR. PEÑA:  Jaime Peña for Mr. Quintanilla, he's

9 present and ready, Your Honor.

10       THE COURT:  Thank you.

11       MR. GARCIA:  Carlos Garcia, Your Honor, on behalf of

12 Arturo Cuellar, with Cynthia Orr and Michael Bro (phonetic).

13       THE COURT:  All right.  Thank you.

14       All right.  We have various issues.  I don't want to

15 take everybody up together for everything, but there are --

16 well, at least there is one that I expect will be the same

17 across the board so I would like to start with that one.

18       But let me first have each Defendant stand up so

19 that I can give -- first of all, may be sworn in.  If I can

20 have you each please raise your right hand to be sworn in.

21       (Defendants sworn.)

22       THE COURT:  All right.  And you each answered yes.

23 I don't know if the Record quite picked it up, but each did

24 answer yes.  So if each one of you will remain standing for

25 just a little bit.

1          For each one of you, of course, you are before the

2     Court for sentencing on, for Mr. John Cuellar one count, then

3     for Mr. A.C. Cuellar, Mr. Quintanilla for a multitude of

4     counts, I won't go through each one individually, but do you

5     each understand that?

6          (Defendants respond yes.)

7          THE COURT:  Okay.  I'll ask each one to speak up a

8     little bit louder since you are at a little bit of distance

9     from the Court.

10          And then, counsel for each, did you receive and

11     review the Presentence Investigation Report?

12          As to Mr. Quintanilla?

13          MR. PEÑA:  Yes. Your Honor.

14          THE COURT:  As to Mr. John Cuellar?

15          MR. MONTALVO:  Yes, Your Honor.

16          THE COURT:  And for Mr. Arturo Cuellar?

17          MR. GARCIA:  Yes, Your Honor.

18          THE COURT:  Okay.  And did you review that with your

19     client?

20          For Mr. Quintanilla?

21          MR. PEÑA:  Yes, Your Honor.

22          THE COURT:  For Mr. John Cuellar?

23          MR. MONTALVO:  Yes, Your Honor.

24          THE COURT:  And for Mr. Arturo Cuellar?

25          MR. GARCIA:  Yes, Your Honor.

1          THE COURT:  As to each one, Mr. Quintanilla, Mr.John

2     Cuellar, Mr. Arturo Cuellar, did you review with your attorney

3     the Presentence Investigation Report?

4          DEFENDANT QUINTANILLA:  Yes, Your Honor.

5          DEFENDANT J. CUELLAR:  Yes, ma'am.

6          DEFENDANT A. CUELLAR:  Yes, ma'am.

7          THE COURT:  All right.  Okay.  Then I won't go into

8     what the guideline range is right now because there are

9     several issues we need to address.  We'll go through that and

10    then I'll tell you for each one of you where ultimately we

11    land.

12         Okay.  So what I would like to start with here is

13    the issue as far as value.  And in that regard I have various

14    arguments.  Ultimately the Presentence Investigation Report

15    ended with a value of 4.1.  I know there have been objections

16    across the board.  One of those objections I think references

17    the guideline application for what is a Government benefit to

18    which under the guidelines are handled slightly different from

19    just valuation in general.

20         So I want to start with that to make sure that we

21    are all operating from the same place, and that is that to be

22    clear, it is the Court's position, and maybe if anybody

23    disagrees with it, I'll certainly consider  it, but it is the

24    Court's position that this is a procurement fraud type of

25    case, not a Government benefits type of case.  A Government

1    benefit case being one for example the guidelines say food

2    stamps, something of that nature, the concern is that we look

3    at that in a more restricted sense.  And so it is the Court's

4    position that it is the general rules for law that would apply

5    in this case.

6         The Government hasn't really touched on this

7    specifically but I know from the defense I got an objection,

8    one that referenced a case at least dealing with Government

9    benefits rather than procurement law.

10        So do you agree kind of as to why this would be a

11   procurement fraud type of case, not a benefits type of case?

12        MR. GULLOTTA:  Yes, Your Honor.  The Government

13   agrees that it's not a benefits type of case.  And I think

14   even more clearly stated perhaps is that this isn't -- I don't

15   think the PSR nor the Government's calculation deals with

16   loss.

17        THE COURT:  Right.

18        MR. GULLOTTA:  It's not about loss, it's about the

19   value of the payment, which is the first item in

20   2(c)1.1(b)(2).

21        THE COURT:  Right.

22        MR. GULLOTTA:  In terms of the value --

23        THE COURT:  I'm just using the term loss sort of

24   broadly because we're looking at that value to see where --

25   what it has been as applied in this case.  So, okay.  So I'll

1    just go in the order -- Mr. Garcia, do you agree with what the

2    Government has said?

3             MS. ORR:  I will speak here with regards to --

4             THE COURT:  Okay.  I'm going to have one counsel

5    address it, so if you're going to address the Court on these

6    issues, it'll be across the board.  I'm not going to have two

7    counsels speaking for one --

8             MS. ORR:  That's fine, Your Honor.

9             THE COURT:  Okay.

10            MS. ORR:  Thank you.

11            THE COURT:  Sure.

12            MS. ORR:  I do agree with the Court that this is not

13   a benefits case, but I also would agree with the Court that

14   this is a payment case where we're talking about the quid pro

15   quo, and I briefed this in my objections at Page 6, Your

16   Honor.

17            THE COURT:  Okay.  All right.

18            Mr. Peña?

19            MR. PEÑA:  Procurement case, Your Honor.

20            THE COURT:  Okay.  And, Mr. -- I'm sorry,

21   Mr. Montalvo.  I'm not seeing you, so --

22            MR. MONTALVO:  Oh, yes, Your Honor.

23            THE COURT:  There you are.  There you are.

24            MR. MONTALVO:  Yes.  I agree with procurement with

25   respect --

1          THE COURT:  Okay.  Okay.  So with that in mind, and

2     there was an argument, again, the (indiscernible) are

3     ultimately settled on the one million.  There was I think

4     initially some argument from the Government that it would be

5     the 38, and I don't believe that that would be the case at

6     all.

7          So I think where the Court is at, and I'll again

8     hear from counsel, but the issue -- and we did receive

9     recently this impact statement from the City of Weslaco and

10    they say basically, We don't have an amount at this point in

11    time, and it'll be quite some time before we get an amount.

12    So the Court is not inclined to wait for that, but may

13    ultimately -- that civil case may ultimately be resolved

14    without it even getting to that point.  But if it does, it

15    likely is quite some ways down the road.

16         So this is what my thinking is at this point in

17    time, and again, I'll hear from all counsel, but we have your

18    context that together the amount that has been sort of put out

19    there is 38.5 million.  I know there was different figures

20    from each one of the different entities here, CDM, Briones and

21    Lefevre.

22         But even just considering the total of 38.5, we have

23    evidence that, you know, I think is what the jury relied on

24    that there were -- payments were jointly from those entities

25    to Mr. Lopez totally 4.1 million.  And then that got disbursed

1    differently to different parties.

2            But if you consider that they have a contract for

3    38.5 million altogether, again, I'm looking at this

4    altogether, and they're willing to pay out 4.1 to obtain those

5    contracts, and they may have had expectation outside of more

6    in the future , but at least looking at it that way now, it

7    would seem to me that at the very, very least there is a

8    profit greater than 4.1 to be made in the case, otherwise why

9    would you pay that much out if you weren't going to gain more

10   than that.

11           So I don't think the more would be $100, because it

12   doesn't seem to be that you'd be willing to run the risk here

13   for $100, I think it would be something substantially more

14   than $100.  And it might very well be substantially more than

15   $4 million.  But totally it would be something more than $4

16   million if you expected to gain from these contracts,

17   otherwise why would you be willing to pay that much to obtain

18   these contracts.

19           And so my inclination is to say that that would be

20   the amount that we're looking at here.  And I don't know if

21   the Government has accepted that position.  I know that you

22   objected initially to what the valuation was in the PSR with

23   the 4.1.  But I'll hear from the Government to see where you

24   stand at this point.

25           MR. GULLOTTA:  Thank you, Your Honor.  The

1      Government agrees that 4.1 million is the correct number to
2      use to determine the increase under the table in 2(b)1.1.  I
3      think when submitted out objections they were sort of --
4              THE COURT:  And I'm sorry, the Defendants may be
5      seated themselves, and, Counsel, if you want to sit until
6      you're addressing the Court, you may do so.
7              MR. GULLOTTA:  And they're sort of prospective
8      objections, and by that I mean to the extent the Government
9      were able to determine the net profit, the net value of the
10     38.5 or whatever it was million dollar contracts, that number
11     would likely be the highest number and therefore the
12     appropriate number to use.  Because under 2(c)1.1(b)(2) it
13     instructs that you look at either the value of the payment,
14     the benefit received, and that's what the contract value would
15     have been, the value of anything obtained by a public
16     official, or the loss to the Government.
17             With respect to the value -- the benefit of the
18     thing to be received, it's the net value.  So we would need to
19     show what the contractors received minus their costs.  And the
20     Government's not prepared to do that.
21             THE COURT:  And I don't believe it can be done.
22             MR. GULLOTTA:  We don't have enough information for
23     that.  So I don't think we can use the benefit received or to
24     be received in return for that payment.  With respect to the
25     loss amount, as the Court just noted, the City of Weslaco has

1    provided that document that we all looked at but it's somewhat

2    of an estimate, it's not exact.  It lists I think $10 million

3    as an expected loss, but it's by no means I think strong

4    enough evidence of what the loss to the Government is.  So I

5    don't think we can use loss to the Government either.

6        I think that leaves us with the value of the

7    payment, and the payment is the $4.1 million that the

8    contractors gave to Leo Lopez which Leo Lopez then used to

9    orchestrate the bribery scheme that the jury rendered the

10   verdict on.  So he kept a portion of that 4.1 million, and

11   then funneled the remainder of it downstream through the

12   Defendants to the public officials.

13       So the value of the payment, which is the first one

14   listed here, is $4.1 million and the Government believes

15   that's the correct (indiscernible).

16       THE COURT:  I will say that I think another way of

17   looking -- you know, I think I've read every 5th Circuit case

18   on the issue that was probative here, but so the 5th Circuit

19   has talked about in these situations looking at fair market

20   value and so in looking at that it kind of goes back to -- you

21   know, you said it in slightly different language, but what the

22   Court is saying is that there's -- it's very difficult like in

23   this case to measure the value of the services the City did

24   receive.

25       Presumably they'd received some services for these

1  contracts, you know.  I don't have anything to show what those

2  services were, but presumably they'd received some services.

3  And presumably they -- had they gone out on the open market so

4  to speak and engaged in competitive bidding, they presumably

5  would have had a better deal here.  So you can't really deduct

6  the value of the services from the total contract price, we

7  don't -- because we don't have that value of the services.

8          But so going back to my very simplified assessment

9  here that at the very least you would think it's 4.1 that

10  they -- more than 4.1 that they were going to profit here.

11          So, Mr. Peña, with that understanding do you want to

12  go first?

13          MR. PEÑA:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. PEÑA:  As far as like I do believe the

16  determination for the calculation on the loss amount is a

17  multi-step analysis and that Step 1, my understanding is we're

18  at, which track we're going to take.  I do agree with the

19  Government at this point, which is if we were to look at the

20  various tracks that are put before us, the amount of payment,

21  which would be the 4.1, is the beginning point.  So initially,

22  you know, we agree with that step in the process, Your Honor.

23          THE COURT:  And we speak to that step in the process

24  just saying that for Mr. Quintanilla that would be the amount

25  or there would be something -- a second or third step.

1       MR. PEÑA:  Yeah, a second or third step, Your Honor,

2   because ultimately the analysis begins -- well, where do we

3   start?  Do we start with no value?  I would ask the Court to

4   elaborate.  But the first step is, Okay, if we can't determine

5   this one and we can't determine the loss, then we start here.

6       THE COURT:  Okay.

7       MR. PEÑA:  So starting here at the 4.1 as the

8   number.

9       THE COURT:  Okay.

10      MR. PEÑA:  Then the next consideration, which I

11  don't know if you want me to address it now --

12      THE COURT:  I just want to -- because I wanted to

13  look at value add.

14      MR. PEÑA:  Okay, Your Honor.  So the next step in

15  the analysis then, and there's some cases across the different

16  circuits on this issue, which is do we -- should the Court

17  hold Mr. Quintanilla accountable for the rest of the co-

18  conspirators, which is where big dispute is --

19      THE COURT:  Okay.

20      MR. PEÑA:  -- because our dispute is although the

21  Court starts at 4.1 million, he should only be held

22  accountable for what he actually benefitted.  And we cite the

23  cases there, because you look at a number of factors to say

24  was he knowledgeable of the conspiracy in total, did he assist

25  the rest of the co-conspirators.  There are multiple

1    conspiracies as far as if we look at the evidence that's

2    presented at trial, Mr. Quintanilla had a relationship with

3    Mr. Tafolla.

4            The evidence at trial was that there was an

5    arrangement between Mr. Quintanilla and Mr. Tafolla.  The

6    evidence indicates that Mr. Quintanilla received $85,000 from

7    Mr. Lopez and that he then distributed that.  There was no

8    evidence that there was an agreement or any understanding

9    between Mr. Quintanilla and Mr. Lopez.  The Government drew

10   inferences.

11           THE COURT:  Of Mr. Quintanilla and Mr. Lopez?

12           MR. PEÑA:  That's correct, Your Honor.

13           THE COURT:  Okay.

14           MR. PEÑA:  The issue is, and one of the --

15           THE COURT:  I'm sorry, I'm having a hard time with

16   that one because the payments came through Mr. Lopez so how is

17   it that you claim there's no evidence --

18           MR. PEÑA:  This was the dispute in the trial, Your

19   Honor.  So --

20           THE COURT:  But the jury came back.

21           MR. PEÑA:  Well, and I understand that.  That's why

22   I'm not contesting that.

23           THE COURT:  All right.

24           MR. PEÑA:  And so in order to discuss the hearsay

25   type evidence because the Court can consider hearsay during

1     sentencing, that there was evidence that we attempted to enter
2     into trial.  Now that's a fight for another issue.
3          But the gist of that was that Mr. Lopez in a
4     recorded statement, which was one of the wires, was talking to
5     Mr. Quintanilla and he told him, I don't know if you paid, you
6     know, I don't know if you paid Mr. Tafolla.  But if they're
7     asking questions, you need to tell me, did you pay him.  And
8     at that time he was attempting to elicit some type of
9     admissions from Mr. Quintanilla.  Now he wants the answer, it
10    was hearsay at trial --
11         THE COURT:  But even assuming that we look at that,
12    okay, obviously we get -- we have evidence that Mr. Tafolla
13    was paid by Mr. Quintanilla.
14         MR. PEÑA:  That's correct, Your Honor.
15         THE COURT:  Okay.  Okay.  So this is not a situation
16    where any one of these entities paid Mr. Quintanilla directly
17    and then separately paid Mr. Lopez who then paid Mr. A.C.
18    Cuellar, in which case your argument about he shouldn't be
19    held accountable for the entire amount would make a lot of
20    sense because you could then argue that, look, there's the
21    conspiracy over here involving Mr. Lopez and Mr. A.C. Cuellar
22    and we have a separate conspiracy here where the same
23    entities, you know, happen to be paying Mr. Quintanilla who
24    then pays Mr. Tafolla.
25         But we have Mr. Lopez being the one person who's

1    receiving these monies from these entities and then moving

2    forward.  So --

3              MR. PEÑA:  And the evidence --

4              THE COURT:   -- I hear you but I don't agree with

5    you.

6              MR. PEÑA:  Well, no, I understand, Your Honor.  So,

7    look -- and actually I have -- if I can just to rule out

8    (indiscernible) and to help assist the Court during my

9    argument.  If I can --

10             THE COURT:  To me or --

11             MR. PEÑA:  Yes, here, Your Honor.

12             THE COURT:  Yes, yes, to Ms. Guillen, please.

13             MR. PEÑA:  Now as you recall during the trial, and I

14   think the evidence that's been elicited so far in the case is

15   that the Government was attempting to establish there was a

16   conspiracy, and you can see on the left hand side we have here

17   which report we reference that there was a potential

18   conspiracy between the construction company, the engineers and

19   Mr. Lopez, and the evidence of this is where he received the

20   4.1 million.  Now we didn't get into it at trial, there was

21   limitations at trial regarding that.

22             Now the only other evidence is you can see there's

23   two tracks.  And this is significant for Mr. Quintanilla.

24   There was no evidence and there has been no evidence in this

25   case that, number one, Mr. Quintanilla had any knowledge

1    whatsoever about A.C. Cuellar's relationship to Mr. Lopez,

2    John Cuellar's relationship, and I think even at trial when

3    there was ever any questions about did they know

4    Mr. Quintanilla, they did not know Mr. Quintanilla.

5           So, and that's why I broke this up into three parts,

6    because that first part is, and that's part of the argument,

7    that any amount that was paid to Mr. Cuellar and ultimately

8    Mr. John Cuellar, according to the law should not be applied

9    to Mr. Quintanilla.  There's no evidence to support that.

10          Now you should go to the 4.1 million which would

11   have been the net of what Mr. Lopez kept, if we're using the

12   calculations that --

13          THE COURT:  What he received is what I understand.

14          MR. PEÑA:  I understand, what he received.  But,

15   well, the only -- then it would be an argument.  Now, the only

16   evidence is he did receive checks, but he received checks to

17   be boots on the ground to go out there and go to City

18   meetings, and there was no evidence that there was an

19   agreement between Mr. Lopez and Mr. Quintanilla that say, Hey,

20   I'm going to give you these checks, and these checks are going

21   to be thank yous to pay Mr. Tafolla.

22          Now the argument I would make --

23          THE COURT:  There is no evidence that the checks

24   were for him to be boots on the ground.  I mean --

25          MR. PEÑA:  Well, he's only --

1    THE COURT:  -- we didn't have a -- we didn't have a

2    defense that shows any of that.

3    MR. PEÑA:  Well, and there's no evidence to the

4    contrary.  There was no evidence --

5    THE COURT:  Well, yes, there's evidence that these

6    were bribe payments that he was receiving to Mr. Lopez to pass

7    on to Mr. Tafolla.

8    MR. PEÑA:  The only evidence is -- no, there were --

9    because Mr. Lopez did not testify, there was evidence of

10   checks from Mr. Lopez to Mr. Quintanilla here.

11   THE COURT:  No --

12   MR. PEÑA:  It was --

13   THE COURT:  -- Mr. Tafolla did testify that he met

14   on various occasions with Mr. Quintanilla and Mr. Lopez was

15   present and Mr. Lopez tendered, you know, to Mr. Quintanilla

16   who in some instances tendered it immediately to Mr. Tafolla.

17   So --

18   MR. PEÑA:  And that's where -- just so that we can

19   get very specific (indiscernible), Your Honor, it was here.

20   There was evidence that they met, there was evidence of

21   conversations between Mr. Quintanilla and Mr. Tafolla.  And

22   whether Mr. Quintanilla and Mr. Tafolla had an agreement, the

23   testimony of Mr. Tafolla, which was not specific and couldn't

24   be specific as to date and time, amount --

25   THE COURT:  Yes.

1          MR. PEÑA:   -- nothing like that, just said --

2          THE COURT:  No, but --

3          MR. PEÑA:   -- it was something that I told --

4          THE COURT:   -- the jury -- but the jury believed --

5          MR. PEÑA:  No, I understand.

6          THE COURT:   -- them apparently.

7          MR. PEÑA:  No, no, I completely understand that.

8    But the issue is was there a relationship that we can define

9    and that purport to make findings on related to Mr. Tafolla

10   and Mr. Quintanilla.

11         THE COURT:  Well --

12         MR. PEÑA:  And that's the starting point, Your

13   Honor --

14         THE COURT:  Okay.

15         MR. PEÑA:   -- because otherwise the Government

16   needs to say, No, we have definite evidence that we can show

17   that --

18         THE COURT:  Well --

19         MR. PEÑA:   -- and according to all factors that he

20   was aware of a larger conspiracy that involved Mr. Lopez and

21   involved the construction company, et cetera, et cetera, and

22   it's their burden --

23         THE COURT:  No.

24         MR. PEÑA:   -- to demonstrate that.

25         THE COURT:  No.

1        MR. PEÑA:  Which they can't.

2        THE COURT:  So I'll say a couple of things and we'll

3    move on to whatever you think is the next step for

4    Mr. Quintanilla.  So, one, I do think, one, you can make

5    reasonable inferences from the evidence, and I do think that

6    even if Mr. Tafolla was not able to say, I met on, you know,

7    February 9 of, you know, whatever year and, you know, we met

8    at this location and, you know, even if he wasn't able to go

9    into details, what he did say was, On some occasions I met

10   with Mr. Quintanilla and Mr. Lopez, Mr. Lopez tendered over to

11   Mr. Quintanilla, in some instances there were checks, some

12   instances there was cash, tendered that over, in some

13   instances he then and there gave me half of that amount.

14       So I think from that you can draw the reasonable

15   inference that, yes, he's aware of and involved with

16   Mr. Lopez, and that can -- one I think was determined by the

17   jury because otherwise, you know, I don't know that we'd have

18   all the findings that -- or all the verdicts that we have on

19   those counts.  But the Court can make that determination as

20   well, so.

21       Okay.  So what is the next step you think for

22   Mr. Quintanilla as far as a valuation?

23       MR. PEÑA:  And the valuation, Your Honor, then the

24   test for the Court, and I put this on the first page, and

25   actually I have it under 1B for the Government ahead.  But the

1       issue there is jointly -- a joint enterprise.  And again, this

2       dovetails into what we're talking about, because the amounts

3       that I've seen is -- should amounts be deducted from

4       Mr. Quintanilla.

5               If we start at the 4.1 million, should he be held

6       accountable for everybody's, and I think I pled, Your Honor,

7       A.C. Cuellar and John Cuellar had not been included, those

8       should be deducted from this.  And then the issue we have with

9       Your Honor is of course with Mr. Lopez and Mr. Quintanilla.

10              So ultimately that's the argument, Your Honor.  It's

11      just that we should be deducting amounts because in the end

12      the total amount from all the evidence, and I know the

13      Government started at 38 million and then we go to 4.1

14      million, there's even more that's going to be gained by the

15      construction company, et cetera.

16               But in the end Mr. Quintanilla over several years

17      only received $85,000, and that's just the reality of the

18      situation as it relates to Mr. Quintanilla, which evidence the

19      fact he's not a leader, it's like -- which we can address at

20      some other --

21              THE COURT:  And we'll address  it.  All right.

22      Okay.  Thank you, Mr. Peña.

23              Okay.  I'll turn -- I am sorry, Counsel, I forgot

24      your --

25              MS. ORR:  Cynthia Orr.

1          THE COURT:  Orr.  Okay.  Ms. Orr.

2          MS. ORR:  Thank you, Judge Alvarez.  I'm approaching

3     the Court with Defendant's Exhibit 1 --

4          THE COURT:  And hand it to Ms. --

5          MS. ORR:  -- comments -- yes, Your Honor.

6          THE COURT:  -- Guillen.

7          MS. ORR:  -- some comments that the Court made and

8     I want you to put your thinking cap and also to put in the

9     Record for the appeal, yes.  This is a declaration by John

10    Shaw who I know, Judge Alvarez, you know attended the trial

11    for Carlos Garcia, and he is making the --

12         THE COURT:  I'm sorry, this is a declaration?

13         MS. ORR:  From Mr. John Shaw.

14         THE COURT:  And why wasn't this filed previously?

15         MS. ORR:  Because he finished it --

16         THE COURT:  Okay.

17         MS. ORR:  -- he signed it last evening.

18         THE COURT:  So now I have a deadline for submission

19    of anything that is to be considered by the Court because I

20    take a lot of time to look at everything.

21         MS. ORR:  Yes, Your Honor.

22         THE COURT:  Not just on a big case like this, but

23    for a little case, even one with a range of zero to 6 months.

24    Okay.  I look at all this material ahead of time.  And I'm not

25    inclined to sit here and go through this now when I had a

1    deadline in place for addressing all of this and filing all of

2    this.

3          MS. ORR:  I understand, Your Honor.  This is what I

4    was able to get prepared last evening after I reviewed all the

5    transcript that I was able to obtain, and this makes the point

6    that we should not compare, and I'll say this orally, we

7    should not compare a bid process contract with what happened

8    here which as Your Honor knows from the testimony, Judge

9    Alvarez, that the testimony was that this was a health and

10   safety concern, and so that this was not subject to the normal

11   bid process.  It had to be hastened so that Weslaco could have

12   a working water system and sewage treatment system that was --

13         THE COURT:  The point of the argument is that the

14   City had this notice way back when, you know, they were slow

15   moving to begin with, the point of your argument is, an

16   inference at least, that the reason it was done as an

17   emergency was because, you know, already there was -- I don't

18   know if there was actual evidence of actual payments because

19   the Government concedes that they believe some of the story it

20   was quite some time before what they actually ended up

21   indicting on, but the point of the argument is that that's

22   part of sort of the overall scheme here is to have it be done

23   in such a manner that they didn't have to go out for open

24   bids.

25         MS. ORR:  Your Honor, all the testimony at the trial

1      was that this had become an emergency situation that Weslaco

2      was on notice from TCOQ from 2004, it was about to be fined on

3      a regular basis.  I think if memory serves, Judge Alvarez,

4      from around 2008 to 2009 and that there was a unanimous vote

5      by the commission that this was an emergency situation.  So I

6      really don't think that there's any testimony that disputes

7      that.  I understand what the Court is saying, and I remember,

8      you know, having a sense that that was the expectation, but

9      the testimony did not bear that out.

10          And so I would agree with the Court that we don't

11     know where that civil lawsuit will end up, if anywhere, but

12     the -- making some sort of analysis that the City did not get

13     the benefit of this and that we can somehow determine in what

14     way they did not is not a way to assess the loss.

15          I would join my colleague's able arguments,

16     Mr. Peña's.  I agree with him about we have this separation,

17     bifurcation in terms of the proof about payments going from

18     Leo Lopez to A.C. Cuellar and then to John Cuellar appears

19     completely divorced from what was happening between Leo Lopez,

20     Mr. Quintanilla and Mr. Tafolla.

21          And my reading of the transcripts, Your Honor, was

22     that the only interaction Mr. Tafolla had with Mr. Cuellar was

23     to actually try and contact him to mend actual physical fences

24     in Weslaco, nothing related to this water treatment plant, or

25     sewage treatment plant building and repair, so that like

1      Mr. Peña I would implore the Court to take that two-step

2      analysis.  We start with the 4.1 million paid by Leo Lopez to

3      others for consulting, for bribes, because there was testimony

4      there certainly was some consulting.

5            Then we take it down to A.C. --

6            THE COURT:  Actually there was no testimony that any

7      of this was consulting payments.

8            MS. ORR:  I --

9            THE COURT:  I know that that's a defense but there

10     was no defense presented to that effect.

11           MS. ORR:  Well, then let me -- let me talk about it

12     this way, Judge Alvarez, the testimony by John Cuellar was

13     that he received $405,000 and that's the amount he received in

14     bribes.  And, Your Honor, that's the value of the payment that

15     I want this Court to consider when evaluating the guidelines

16     because that we know --

17           THE COURT:  Well, but wait a minute --

18           MS. ORR:  -- that might be proved --

19           THE COURT:  -- but that might be an argument that

20     could be made for Mr. John Cuellar, but that's not what

21     Mr. A.C. Cuellar received.  He received --

22           MS. ORR:  That's correct.

23           THE COURT:  -- much more than that.

24           MS. ORR:  He did, Your Honor, and the testimony was

25     that he did receive much more in checks paid to him, but he

1    wasn't someone that could affect the voting of the contract,

2    other than the value that --

3            THE COURT:  Well, Mr. John Cuellar, certainly he

4    was.  And I guess that was -- I mean that's the whole gist of

5    this case.

6            MS. ORR:  When we're here on a bribery case, Your

7    Honor --

8            THE COURT:  Right.

9            MS. ORR:  -- and it's the quid pro quo as I argue

10   at Page 6 of my memo, this is this for that, and so it was

11   405,000 for Mr. Cuellar's votes, and that's what I'm

12   encouraging the Court to find the amount there.

13           THE COURT:  But Mr. A.C. Cuellar was in this because

14   he had access to Mr. John Cuellar.  There is no evidence and

15   was no presented that Mr. A.C. Cuellar performed any

16   legitimate consulting work for any of these entities that

17   would entitle him to a single penny.

18           MS. ORR:  I understood that there was testimony that

19   he was influential and able to make introductions and

20   important in that respect so that there is some evidence --

21           THE COURT:  That was --

22           MS. ORR:  -- of consulting --

23           THE COURT:  -- that was the point of the question,

24   but nobody testified that that was, in fact, the case.

25           MS. ORR:  I understood that there was testimony in

1      that regard, and, Your Honor, I did not attend the trial like

2      yourself, so, you know, I guess we'll let the Record speak for

3      itself, Your Honor.  But what I would say, Judge Alvarez, is

4      that we're talking about quid pro quo and that's a really

5      important thing to focus on on these honest services that the

6      case is, and I'm just arguing to the Court respectfully that

7      the 405,000, that's the quid pro quo and I would ask the Court

8      to consider that when it's determining the value of the

9      payment, because that's the payment at issue in this case.

10              THE COURT:  I'll let you respond to it, too.  Okay.

11              MR. GULLOTTA:  Very good.

12              THE COURT:  But, then, no, I want to hear lastly for

13     Mr. John Cuellar.

14              MR. MONTALVO:  Your Honor, we don't have an issue

15     with the opening bid.

16              THE COURT:  Okay.

17              MR. MONTALVO:  4.1 million is not an issue.

18              THE COURT:  Okay.  All right.  Then --

19              MR. MONTALVO:  Our issue is with the amount that

20     Mr. Cuellar is being alleged to have benefitted from, but we

21     did that in argument, Your Honor, in our filed -- in our

22     objection.

23              THE COURT:  Yeah.

24              MR. MONTALVO:  So we'll take that up, Judge.

25              THE COURT:  Okay.  All right.  Well, just to be

1    clear, Mr. Montalvo, if I determine -- I can determine, well,

2    two things, I can determine that the same amount applies

3    across the board, or I can determine it individually.  If I

4    determine that it applies across the board, this is your

5    opportunity to --

6              MR. MONTALVO:  Well --

7              THE COURT:   -- to address it.

8              MR. MONTALVO:   -- if that's the case, then, Your

9    Honor, I would argue that -- and I know that this is something

10   that the Court already addressed, but in all -- in its

11   entirety, Your Honor, there is quite frankly certain

12   agreements between certain parties in this grand scheme that

13   are taking place without the knowledge of others, specifically

14   Mr. Cuellar.

15             Being that the trial, as the Judge -- Your Honor

16   very well knows, when he was advised of the amount of benefits

17   that were received by A.C. Cuellar, he was just as surprised

18   as anyone else because he had no knowledge about the

19   agreements that he and Mr. Leo Lopez had going on at the same

20   time.  I understand that Leo Lopez paid Mr. A.C. Cuellar, A.C.

21   Cuellar through this Quality Ready Mix would pay Mr. Cuellar

22   the alleged retainer fee for corporate counsel so to speak.

23             But at the end of the day the only benefit received

24   by Mr. Cuellar, the only amount of bribe that can be

25   established by his association with Mr. A.C. Cuellar would be

1    the $405,000, which is what the Government presented at trial.

2    Other than that, the 4.1 million to be assessed and valued

3    against Mr. Cuellar I think is very, very far reaching,

4    because at the end of the day, as the Court will also recall,

5    Your Honor, Mr. Cuellar was approached by Mr. Leo Lopez and

6    A.C. Cuellar when he wanted to leave the City of Weslaco, when

7    he wanted to leave the City commission altogether, and he was

8    told, Stick around, stay here, pay him.

9          And that's one of the benefits -- that's the -- in

10   the grand scheme of things that's the only benefit Mr. Cuellar

11   received was the $405,000.  I believe that's the valuation

12   that we should be assessed against Mr. Cuellar.

13             THE COURT:  All right.  Thank you.

14             All right.  You may respond.

15             MR. GULLOTTA:  Very -- thank you, Your Honor, very

16   briefly because I think the Court has already zeroed in on

17   this.  The jury convicted these two Defendants of a

18   conspiracy, and the conspiracy was alleged to have involved

19   Leo Lopez, as well as others.  So they've all already been

20   convicted of a conspiracy, and the conspiracy involves every

21   Defendant in this room, plus Leo Lopez, plus Jerry Tafolla.

22          The law is pretty clear, they are responsible for

23   the reasonably foreseeable amounts involved in the conspiracy.

24   Even according to Mr. Peña's math.  There is a line drawn from

25   every Defendant to Leo Lopez, including the two trial

1      Defendants, are immediately connected to Leo Lopez.  So no one

2      is trying to assign any value that is apart of another

3      conspiracy.

4              Even if you just look at the conspiracy between

5      Mr. Tafolla, Quintanilla and Lopez, it's 4.1 million, because

6      that's how much Mr. Lopez got.  It's reasonably foreseeable

7      that the person at the beginning of the stream is going to

8      receive a larger amount and break off pieces of those bribery

9      proceeds and share them downstream.  And that's what the

10     Government's argument is.  Thank you.

11            THE COURT:  Okay.  So the Court, again, has looked

12     at it very closely, I read through all the objections, I read

13     through the memorandums, I, as I said earlier, looked at a lot

14     of cases, and ultimately I am satisfied, and it's isn't, you

15     know, that I started out with any figure out in mind, but

16     having gone through all of that ultimately I am satisfied that

17     the proper calculation pursuant to the guidelines in this case

18     is the 4.1 that was assessed, the enhancement was assessed in

19     the guidelines.  So that I do believe applies across the

20     board.

21            And obviously I'll hear individually from attorneys

22     on other issues, but that one, the objections to that

23     enhancement is overruled, it is as calculated in the

24     guidelines.  So with that then I'm going to go individually

25     now Defendant-by-Defendant and I want to start with

1    Mr. Quintanilla.

2          MR. PEÑA:  Yes, Your Honor.  So going back there

3    are -- I want to focus in --

4          THE COURT:  So let me -- a couple of things for

5    Mr. Quintanilla that I see.  There's some things that I

6    believe I can --

7          MR. PEÑA:  Already agreed.

8          THE COURT:   -- agree on already.  Let me look at my

9    notes and see.

10         (Pause in the proceedings.)

11         THE COURT:  No, I don't think I agree, so let's move

12   forward.

13         MR. PEÑA:  Okay, Your Honor.  Going back to the

14   chart and the first day I outlined 4 basic arguments.  We've

15   already covered 1 and I think 3.  The first one, and I marked

16   there the guidelines calculations under the letter A which is

17   there was an assessment that this was more than one bribe.

18   And our position is that it should be treated as one bribe.

19         The case law is simple, it's if you have related

20   payments, then the related payments should be treated as one

21   when it is towards the same purpose, i.e. the same conspiracy,

22   the same scheme, and that's what we have in this case.  It

23   would be unfair, it's against state law and against the

24   commentary in the guidelines that say, Well, if you broke up

25   that same payment for the same purpose in different steps,

1    we're going to treat one as an individual bribe.  And that's

2    just not consistent and that's what we outlined in our memo,

3    and that's the argument today.  We believe that the Court

4    should reduce it by 2 points that was assessed in the PSR

5    because of one bribe.

6            THE COURT:  So I did look at it, and this is the one

7    that Mr. A.C. Cuellar also argues, so if you want to jump in,

8    Ms. Orr, I'll have you -- hear from you as well before I

9    address it.

10           MS. ORR:  Thank you, Your Honor.  I would just join

11   with what able counsel, Mr. Peña, said, Judge Alvarez, and we

12   take the same view.

13           THE COURT:  Okay.

14           MR. MONTALVO:  Your Honor, we also addressed that

15   objection in our objection.

16           THE COURT:  All right.  Thank you.  So I did look at

17   that comment a little closer and I think the reason I'm

18   convinced that the plus-2 is warranted here is because we have

19   different actions going on and this is over the course of more

20   than one year here.  The action from the City council was not

21   a one-time action, then, Okay, we're done.  And even though

22   the contract may continue moving forward, and there may be

23   down the road payments that are being made.

24           Or there's -- and I know it's separate context, but

25   for the sake of brevity here, the $38 million contract, even

1    if the City is making payments down the road on that contract,

2    I don't think we can say in this case that the bribes were for

3    the initial awarding of the contract even though that contract

4    is paid out over time, that there was no evidence of these,

5    why payments were then corresponding as that contract gets

6    paid down, we'll pay you this much more.

7            I think in this case the evidence, and again, maybe

8    not said in so many words, but the inferences are that

9    basically they want to ensure that this was awarded to those

10   entities, and for anything else that came up along the way

11   related to the waste water treatment plants was awarded to

12   these entities.  And we have -- over the course of time we

13   have the initial award, we have some modifications, we have

14   the preliminary studies being done, all of that going to these

15   entities.  And so these I do not believe are payments for one

16   bribe, but rather separate bribes along the way.

17           MR. PEÑA:  Could I just say one important thing as

18   it relates to Mr. Quintanilla?  So a couple of things, the

19   time periods, it's not commonly called the Defendants and co-

20   conspirators in this case, but the time period is different

21   for the different Defendants.  And Mr. Quintanilla's was

22   alleged to be from 2011 to 2014.

23           Now at trial, there was an amendment to reduce that

24   time period.  So as far as the number of payments, it is not

25   Mr. Quintanilla that is receiving payments all throughout the

34

1    long period of time, as far as it is alleged as to the

2    bribery.  It was then reduced to a small period of time, I

3    think 2013 to 2014 -- oh, and of course the Government has

4    produced the payments at trial.  And that's the evidence that

5    was actually presented.

6             So to say as far as his purpose, his one purpose as

7    it related to Mr. Tafolla, it was not this long ongoing type

8    alleged conspiracy the Government has since 2008 to 2014.

9             THE COURT:  So the conspiracy date as amended right

10   before trial was from January 2011 moving forward for the

11   conspiracy.  Okay.  But keeping in mind that the Court, for

12   purposes of sentencing, can consider evidence beyond what was

13   presented to the jury.

14            But nonetheless even if we have -- and this is

15   from -- we're going through a lot of material here -- by my

16   notes we have the longest 2011.  The preliminary report from

17   CDM being approved, Mr. Tafolla voting in favor of that

18   preliminary report.  We have him then a month or so, not even

19   quite a month later approving the pre-construction contract

20   for CDM and the Briones contract that was re-negotiated and he

21   voted in favor of those.  So those are separate actions.  We

22   have the Lefevre contract in the middle of 2012, Mr. Tafolla

23   voting in favor of that, again, separate actions.

24            MR. PEÑA:  I understand that, Your Honor.  And

25   that's -- those are the actions of Mr. Tafolla.  Now the

1    evidence, which the Government has the burden here, well, what

2    was the evidence of the actual bribes.  One was the testimony

3    of Mr. Tafolla.  Mr. Tafolla's testimony at trial was he

4    believes he received between 10- and $15,000 during the entire

5    period of time.

6            There was no evidence whatsoever as far as the

7    timing of these payments as far as if they occurred at the

8    time that the votes occurred.  There was absolutely no -- he

9    couldn't remember when he got them, couldn't remember the

10   amounts he got, he doesn't know --

11           THE COURT:  Okay.  Well, Mr. Peña, the jury

12   determined that he took payments for bribes.

13           MR. PEÑA:  That is right, Your Honor.

14           THE COURT:  So --

15           MR. PEÑA:  At sentencing it comes to you now.

16           THE COURT:  Right.

17           MR. PEÑA:  Because you heard -- you have the benefit

18   of all of the evidence that's been presented before you,

19   including the exhibits in our memos --

20           THE COURT:  Right.

21           MR. PEÑA:   -- so that you can take at the time of

22   sentencing -- although the jury did convict, and we accept

23   that for the purpose of sentencing, Your Honor has a lot more

24   information before it.

25           THE COURT:  But it would be -- you know, common

1      sense sometimes does play a role here, it would not make any

2      sense to say, you know, he's taken the actions that he's being

3      bribed for, you know, here, but just randomly he's receiving

4      money a year later.  Okay.  So it would just make sense that

5      he's receiving those bribes for the action that's expected of

6      him, which are these votes.

7                MR. PEÑA:  But there needs to be a finding from Your

8      Honor and then maybe present evidence to support that finding

9      from Your Honor.  And then --

10               THE COURT:  I think that inference can be made from

11     the evidence that was presented at trial with the jury having

12     convicted him on these counts, and keep in mind that they did

13     have dates of the votes, they did have a lot of that -- well,

14     all of that information in front of them through the minutes.

15               MR. PEÑA:  But the test is the bribe, and there's no

16     evidence of the bribe.  And the bribe --

17               THE COURT:  Was --

18               MR. PEÑA:  -- when it was amended and you tried it

19     at trial, the bribes were alleged to have occurred much later

20     than those votes.

21               THE COURT:  Well, no, you said that he couldn't say

22     when the bribes occurred.  So --

23               MR. PEÑA:  Right.  But what price -- what the

24     Government charged --

25               THE COURT:  Yeah.

1           MR. PEÑA:  -- and what the Government presented to

2     the jury, it then shortened --

3           THE COURT:  Well --

4           MR. PEÑA:  -- that time period --

5           THE COURT:  No, no, no, the January 11 of 2011, and

6     what I cited to you is in 2011.

7           MR. PEÑA:  I can go through the votes for

8     Mr. Tafolla but that's not when the Government charged, and

9     they're the ones when -- they actually charged the bribery of

10    the case they reduced the --

11          THE COURT:  The conspiracy is what we're talking

12    about.

13          MR. PEÑA:  But it's the conspiracy for the bribery.

14          THE COURT:  Right.

15          MR. PEÑA:  And the only evidence that was presented

16    to the jury was that alleged bribery had occurred in the last

17    tail end of this, not during the time of any of those votes.

18    Mr. Quintanilla -- there's no evidence against Mr. Quintanilla

19    individually.  And I speak of Mr. Quintanilla as far as when

20    bribes or if bribes occurred during the period or how many

21    bribes actually occurred.

22          THE COURT:  All right.  Well, the Court does believe

23    that we have multiple bribes here, so that adjustment is

24    overruled.

25          MR. PEÑA:  Thank you, Your Honor.

1           THE COURT:  All right.  Next from Mr. Quintanilla,

2     Mr. Peña.

3           MR. PEÑA:  Next, Your Honor, is, as labeled under C

4     in our memo, we're asking for a -- the PSR said no role

5     adjustment downward, we do believe that the evidence that was

6     actually presented in the case, and there's multiple factors.

7     One, with a minimal gain by Mr. Quintanilla.  In the grand

8     scheme, no profit we're talking about millions.  And

9     ultimately all any evidence is, and I think there's no

10    dispute, Mr. Quintanilla received $85,000.  That's one factor.

11          Second, there's no evidence demonstrating his

12    knowledge of the scope of this conspiracy, or the other

13    factors, the other parts, or the vendors and all this bidding

14    process and none of this stuff as it applies to

15    Mr. Quintanilla.

16          And then ultimately the totality of the

17    circumstances which is -- and the courts have opined on this

18    issue, which is when you have a situation where you have a

19    defendant who receives such a small gain in comparison to the

20    overall totality of the circumstances, that sentence would end

21    up becoming lopsided against him.  The Court has the power to

22    reduce that down and to, especially his portion of it and the

23    minimal participation, so we ask for the Court to reduce it by

24    4 points and make a role adjustment in that regard.

25          THE COURT:  In that regard, again, I look at these

1    things very closely, you know, look at, you know, the factors

2    that the guidelines provide the Court should consider, I have

3    often expressed a disagreement with many of those factors, and

4    in this case, you know, I have some disagreement as well.

5          But we're talking here about whether this Defendant

6    is substantially less culpable than the average participant in

7    this offense.  We're not talking about him being involved in

8    the actual procurement of these contracts, in which case you

9    might say he knew nothing about what was actually being, you

10    know, put forward, what the times of the contracts were, what

11    the gain would have been to the entities here.

12          We're looking at the bribery scheme.  And in the

13    bribery scheme I don't see how, you know, he is substantially

14    less culpable than the average participant, the participants

15    here are the companies themselves and, you know, who

16    individually from those companies I don't know, but the

17    companies themselves, Mr. Lopez, Mr. Quintanilla, Mr. Cuellar,

18    Mr. Tafolla, and Mr. John Cuellar.  So those are the

19    participants.

20          You know, you're really sort of looking at this,

21    although I don't think Mr. John Cuellar may bring my words

22    back to haunt me, but, you know, if you're looking at a

23    hierarchy here, you would say, well, really the people at the

24    bottom of the totem pole here are Mr. Tafolla and Mr. John

25    Cuellar, and Mr. Lopez maybe was at the top but I think

1      Mr. Quintanilla and Mr. A.C. Cuellar were the average

2      participants here.

3              MR. PEÑA:  And these are the concerns, Your Honor,

4      is the flipside.  So in one instance the Court will say, Look,

5      I'm going to look at this as being a grand total conspiracy

6      and I'm taking into consideration the entire conspiracy.  And

7      then Your Honor in this instance saying, Well, I'm not looking

8      at the conspiracy because if you look at the conspiracy --

9              THE COURT:  Well, no, that's why I named all those

10     people.

11             MR. PEÑA:  Well, but then you're saying it has to do

12     with the bribery and it would be difficult for you to say.  If

13     we're looking at the conspiracy --

14             THE COURT:  Well, no, then why -- 'cause this is

15     what I've been talking about all this time.

16             MR. PEÑA:  Well, and that's what I'm saying, the

17     conspiracy as far as, you know, like for the Government it's

18     the totality of this entire thing.  So, but I understand, Your

19     Honor.  I mean our position is when you look at the grand

20     scheme and all the participants and all the gains of all the

21     participants and all the involvement of the participants,

22     Mr. Quintanilla is --

23             THE COURT:  Well, I don't think I left anything out.

24     I talked about the entities and whoever.  Obviously we

25     wouldn't be including every employee of those entities.

1  Right?  It's whoever there made the decision to engage in this

2  bribery scheme.  So I don't think I've left anybody out here.

3          MR. PEÑA:  I understand, Your Honor.  Our position

4  is that he's the low man on the totem pole, Your Honor.  And

5  as per the law he's entitled to at least a reduction of 4

6  points or a role adjustment for that minor participation.

7          THE COURT:  All right.  That objection is overruled.

8          MR. PEÑA:  Thank you, Your Honor.

9          THE COURT:  All right.  All right.  Mr. Peña, next?

10          MR. PEÑA:  The last one on the calculation is on the

11  obstruction chart, Your Honor, with 2 points added on the

12  obstruction.  As (indiscernible) her testimony, of

13  Ms. Gonzalez, and is a very ambiguous type testimony,

14  combative at times.  But ultimately, and we cited this in our

15  motion, which is, you know, it was very consistent as to what

16  occurred, and ultimately it was all around one word, which was

17  the word consultant, and he took it one way, Mr. Quintanilla

18  as far as he understood it was meaning it another way, and as

19  a result he'd say open and it's quoted, we quoted this in our

20  motion, he said, man, it's semantics, you know?  It was an

21  issue of semantics.

22          And so his question is, was it misunderstood, was it

23  a misunderstanding?  Ultimately he never lied to the FBI.

24  Ultimately there was never was an obstruction.  And than him

25  believing that he wanted to use a word, they had a different

1    understanding, there is no evidence of obstruction.  As a

2    result we believe the Court should remove the obstruction 2

3    points.

4              THE COURT:  I looked hard at that, if ever I think

5    there was a clear instance of an attempt to obstruct, this was

6    it.  And I think the reason -- and Mr. Gonzalez at times came

7    across as combative is because I think quite frankly the

8    impression I got was that he was appalled that anybody would

9    have the nerve to come ask him to do this.

10             And I think if we, you know, look at it, you know,

11   very objectively, that there is no question but that he was

12   being asked to mislead at the very, very least the FBI if not

13   to outright lie to the FBI.  And I think that was especially

14   demonstrated when Mr. Quintanilla steps out and when the -- I

15   can't remember if it was few minutes or seconds he comes right

16   back in and gives him that parting message which I think

17   leaves no doubt of what Mr. Quintanilla was asking.

18             MR. PEÑA:  In response is the Court can consider

19   hearsay.  So the full context of the situation.  This was a

20   situation -- Your Honor recalls there's an email from my

21   office to Mr. Gonzalez requesting a copy of the checks because

22   we were aware of the checks that Mr. Gonzalez had given to

23   Mr. Quintanilla.  Mr. Quintanilla then went to go get copies

24   of those checks that I requested in the case.  And this is the

25   letter that was handed over to the FBI.

1          Now -- and this was presented to Your Honor at the

2    time -- there was no question that checks were made, and these

3    were checks during political campaigns, and these were checks

4    that were paid to Mr. Quintanilla to then help with the

5    campaigns and his understanding was he was a consultant for

6    him, helping because Mr. Gonzalez was attempting to become a

7    City official.

8          THE COURT:  But see, Mr. Peña, here's the problem,

9    if Mr. Quintanilla believed that, why does he need to go tell

10   Mr. Gonzalez, You need to tell them that I was a consultant

11   for you.

12         MR. PEÑA:  Well --

13         THE COURT:  If that Mr. Quintanilla -- first of all,

14   again, we don't have testimony from Mr. Quintanilla at all.

15   Okay.  But if that was what Mr. Quintanilla believed to begin

16   with, there's no reason to go tell somebody, Oh, you know,

17   keep in mind that these checks that you are giving me were

18   consulting checks, because if that's your position to begin

19   with, you don't need to go tell somebody to do that.  And

20   again, even as I noted, you know, his parting message I think

21   to Mr. Gonzalez was quite clear what he expected of him.  So,

22   no, I don't --

23         MR. PEÑA:  Well, and that's where we had issue with

24   the strength of that testimony, and that's why we're asking

25   Your Honor to consider.  I know the jury (indiscernible), but

44

1        Your Honor can consider beyond what the jury --

2                THE COURT:  And quite frankly, again, I had no, no

3        doubts as to Mr. Gonzalez's credibility.  So that objection is

4        overruled.

5                MR. PEÑA:  Thank you, Your Honor.  And as far as --

6        I had three issues, one was the calculations, we were taking

7        the calculations --

8                THE COURT:  Right.  Now this --

9                MR. PEÑA:  -- over my objections, yeah.

10               THE COURT:  Yes.  Okay.

11               MR. PEÑA:  And we'll do the other one --

12               THE COURT:  So right now then as it stands, we are

13       where we started in this case, the objections having been

14       overruled, the Court having determined the issue as far as

15       valuation here, and that is a guideline range for

16       Mr. Quintanilla as calculated in the Presentence Investigation

17       Report an offense level of 40, criminal history category of 1,

18       that range is 292 to 365 months.  I'll give you a chance to

19       address all other sentencing issues in a minute.

20               I don't think there's any need for the Government to

21       respond at the moment to the objections, but I know you had

22       your own objections here.  So, no, so we're looking at the

23       guidelines, I will hear from you on --

24               MR. GULLOTTA:  So I think with respect to -- is this

25       with respect to Mr. Quintanilla?

1          THE COURT:  Mr. Quintanilla only as far as the

2     guideline calculations.

3          MR. GULLOTTA:  I think with respect to

4     Mr. Quintanilla only the only outstanding objection the

5     Government had I that there should be a manager/supervisor

6     increase of 3 levels, not -- I think it was 3 levels.  Yes,

7     not the highest of organizer/leader, and not the lowest, the

8     highest being 4, the lowest being 3 levels.

9          And the reason for it is because there were clearly

10     more than 5 people involved, 5 purchase events, and I don't

11     think that's in dispute.  And Mr. Quintanilla had control over

12     this portion of the scheme.  He's the who that recruited

13     Mr. Tafolla, he's the one who met with Leo Lopez, he's the one

14     who received the money from Leo Lopez, Mr. Tafolla did not

15     know how much, Mr. Quintanilla decided how much he would keep,

16     he decided how much he would give to Mr. Tafolla, and he had

17     regular contact with Mr. Tafolla to make sure that he was

18     voting the way he was supposed to vote in exchange for the

19     bribe payments.  So because of his role in deciding how much

20     of the profits he would get and the beginning of the payments

21     and the end of the payments, the Government believes that an

22     increase for his manager -- managing and supervision of

23     Mr. Tafolla.

24          THE COURT:  All right.  I'll tell you the same

25     thing, you were listening, that I told Mr. Peña, I believe he

1   is the average participant.  Even though I think there's a lot

2   of truth to, you know, the specific facts that you point out,

3   I still believe he is the average participant in the scheme.

4   So that --

5               MR. GULLOTTA:  Very good, Your Honor.

6               THE COURT:   -- objection is overruled as well.

7               MR. GULLOTTA:  Thank you.

8               THE COURT:  All right.  Let me turn then to Mr. A.C.

9   Cuellar.

10              MS. ORR:  Thank you, Judge Alvarez.  We had made an

11  objection with regard to the initial Base Offense Level

12  assigning a 14 instead of a 12, Judge Alvarez, because

13  Mr. A.C. Cuellar was a public official.  We think as we read

14  the description and definition of each of those categories and

15  we get down to the last one where someone doesn't have to be a

16  public official but is assessed this higher starting level,

17  it's clear that the intent is that the person must be a public

18  official with the -- with respect to the offense committed.

19              We don't contest that A.C. Cuellar was a public

20  official, a Hidalgo County Commissioner, at a couple of

21  periods of time during the charged conspiracy.  But that that

22  position did not allow him to influence or any -- exercise any

23  decision making authority with regard to the contracts under

24  consideration that are at the heart of the bribery charge.

25  And so therefore we'd respectfully request the Court to start

1     with a Base Offense Level of 12 instead of a 14.

2          THE COURT:  See, and now that I -- again, I read

3     through the guidelines, I read through the application notes

4     and we have your beginning Base Offense Level dependent on the

5     Defendant.

6          MS. ORR:  Yes.

7          THE COURT:  And in this case there's no dispute that

8     Mr. Cuellar was, in fact, a public official during this period

9     of time, not throughout the whole time but at least a good

10    portion of this period of time.  So there really is no dispute

11    as to that, and went through the time to see, okay, you know,

12    when you have that application and that starting point, and

13    then you have the application for involving a public official,

14    you know, do you apply both.  The latter enhancement is

15    offense specific rather than defendant specific.

16         And here, even though I understand the argument that

17    you made, that last, you know, for definition of category of

18    public official is really a separate one because you have a

19    listing a member of state or local legislature.  You have the

20    second one being the officer/employee, you have a local

21    Government.  You have the third one being somebody who's

22    already been selected but not yet appointed.  And then you

23    have the fourth category being these other individuals that

24    basically have the same responsibilities and discretion as the

25    public official but they're not that.

1          So I don't think that that fourth one is meant to

2     necessarily exclude somebody who is, in fact, a public

3     official, and --

4               MS. ORR:  No, no, that's right, Judge Alvarez.

5               THE COURT:   -- and I don't think -- and I don't

6     think that the guidelines speak necessarily to a public

7     official who is taking the bribe for action related directly

8     to him personally and his personal -- and his duties as a

9     public official.

10          And I'll tell you why.  One of the cases out of the

11     many ones that I have here, one that I have here but I don't

12     remember case names, was one where you have a City mayor in

13     Louisiana who brings together other City mayors to basically

14     all work together in this bribery scheme.  And he has this

15     group of mayors and talking to the entities and at some point

16     in time it becomes the state, but anyway he says, We want to

17     exclude this one mayor because he's a straight up guy, he's

18     not going to go along with this, okay, but these other mayors,

19     yes.  Okay.

20          There's no -- in that case there's no dispute that

21     that mayor has no official responsibility over any other City.

22     Much of the action there relates to, you know, the other, you

23     know, defendants who were involved, the mayors.  So --

24               MS. ORR:  Understood, Judge Alvarez.  My argument

25     was that this definitional list gives us a flavor of what's

1          intended, and that the argument is that, and our position is

2          that it's the -- number one, although in the guideline --

3                    THE COURT:  But it says --

4                    MS. ORR:  -- itself it doesn't say --

5                    THE COURT:  -- but, no, but it says specifically

6          not otherwise covered.  I mean that definition --

7                    MS. ORR:  Yes --

8                    THE COURT:  -- specifically says not --

9                    MS. ORR:  Yes --

10                   THE COURT:  -- otherwise covered.  So if they're

11         covered, we don't need to look at that fourth definition.

12                   MS. ORR:  I agree, Your Honor, but I just think it

13         informs the tone of what the definition is because it's under

14         definitions and I'm relying on that last one, not to say that

15         A.C. Cuellar fits there, but to say that this tells us it's

16         got to be someone who takes action, they've got to be a public

17         official with respect to the offense conduct.  And I

18         understand the case you cited somewhat different, Your Honor,

19         because there these people were joining together and using

20         their position.  Again, I think that's related to the offense

21         conduct.

22                   THE COURT:  Well, and I think what we have here is

23         that actually Mr. A.C. Cuellar joining together with Mr. John

24         Cuellar and using his influence with Mr. Cuellar.

25                   MS. ORR:  I understand.

1          THE COURT:  But Mr. A.C. Cuellar himself being a

2     public official, does anyone have a response on this point?

3          MR. GULLOTTA:  Thank you, Your Honor, yes.  So I

4     read the Defendant's objection, I looked, I couldn't find a

5     case that supports their theory.  I agree that the Defendant

6     fits within one of these definitions.  The definition

7     statement also says, It shall be construed broadly and

8     includes the following.  And so I don't see that there's any

9     basis.  I think the reality is, yes, he did directly influence

10    one of the public officials making decisions on this case.

11    But he also was a public official himself, and public

12    officials are held to a higher standard and there's an

13    increase for that.

14          THE COURT:  All right.  So that objection is

15    overruled.

16          MS. ORR:  In addition we raised an objection that

17    Mr. John Cuellar was not a public official as was countenanced

18    by the guidelines under 2C1.1(b)(3) because he was not a high

19    level decision maker, he was one of 7 of the Weslaco

20    Commissioners and was not, as he testified himself, some

21    important leader of that group, but just merely one of the

22    group that --

23          THE COURT:  Well --

24          MS. ORR:  -- pushed the contract along, Your Honor.

25          THE COURT:  -- no way, I think he's -- that one's

1    overruled, he was definitely a public official, and there was

2    also evidence that for much of this time he was also mayor pro

3    tem.  Next?

4            MS. ORR:  Yes, Your Honor.  The -- not, yes, though

5    I agree with Your Honor respectfully.

6            And then finally we argue that with regard to the

7    obstruction points assessed, the 2 points, here we have a

8    conspiracy that specifically charges this obstructive behavior

9    as part of the actual Count 1 conspiracy in manner and means,

10   Paragraph 26, Subparagraph D.  And, you know, every

11   conspiracy --

12           THE COURT:  So let me -- I'll interrupt you and

13   then --

14           MS. ORR:  Yes, Your Honor.

15           THE COURT:  -- tell you where I'm focusing because

16   this one is one that I am on the fence on.  And so I looked,

17   you know, at the enhancement, and generally speaking it talks

18   about conduct that goes to obstructing an investigation,

19   prosecution or sentencing.  And even though in some regard

20   this obstructed the investigation because -- and in particular

21   because of the attorney/client privilege can impede the

22   investigation.

23           I can't -- I see the point that you raise that this

24   was basically the way the scheme progressed, the way the

25   scheme developed.  And although the guidelines do speak to if

1    it was purposely calculated to -- likely to thwart the

2    investigation.  And I think there's some argument to be made

3    that it was, again, mostly because it goes -- because of the

4    attorney/client privilege issue.

5         If it had just been a, you know, he's a -- as far as

6    I know there's no public accountant privilege like the

7    attorney/client, but let's just say if he said, Oh, just say

8    that you're the accountant and that's what we're paying for --

9    you know, I might not see it that way.  But because it's --

10   if -- I think if the attorney/client privilege is raised,

11   there is much more scrutiny in trying to pierce that to see

12   where the real purpose of these payments are.

13        So I'm sort of back and forth on this one.  I think

14   that there's some merit to the argument here, but I guess I

15   will hear from the Government on this one.  I will tell you

16   that I'm leading towards sustaining the objection, although I

17   think it's a close call.  But it's a close call like in

18   favor -- in favor of leniency to the Defendants.

19        MR. GULLOTTA:  Your Honor, thank you.  So John

20   Cuellar testified that he and his cousin, Arturo Cuellar, came

21   up with a fake cover story that it was a lie, that he did not

22   do any legal services in exchange for --

23        THE COURT:  Well, we know that, so I don't believe

24   for a second that this was for legal services.  I'm just

25   saying that this was the way the scheme played out, the

1    bribery scheme played out.  So I guess that's why I'm a little

2    hesitant because generally speaking the guideline enhancement

3    is for obstruction of the investigation and it's really -- and

4    it does speak to like once you know there's an investigation

5    going on.

6              MR. GULLOTTA:  And so John Cuellar also testified

7    that when he was first interviewed by the FBI he lied to the

8    FBI.

9              THE COURT:  Right.

10             MR. GULLOTTA:  And he told them that he was going

11   legitimate work in exchange for that money.

12             THE COURT:  Right.

13             MR. GULLOTTA:  So that impacted the investigation.

14   Eventually he obviously came around to telling the truth.

15   Arturo Cuellar was also interviewed by the FBI, and he talked

16   about who hired John to be the lawyer for the company and

17   paying John as a lawyer for the company.  So he also lied to

18   the FBI.  So both of these witnesses, who agreed to the fake

19   cover-up story not only agreed to it for the purposes of

20   trying to facilitate the checks so that the people at QRM

21   would go along with writing the checks, but also so that they

22   could fool and impede the FBI.  And they tried to do it and it

23   failed ultimately, but that's not the determining factor.  So

24   I believe that it's pretty clear obstructionage.

25             THE COURT:  Well, I see the point that you make, and

1      I think it is a close call, but because I think it's a close

2      call I think that I err in favor of the Defendant, so that

3      objection is sustained.

4              MS. ORR:  Thank you, Your Honor.  Just for purposes

5      of the Record, I do recognize, Judge Alvarez, you've made your

6      rulings about the amount.  I just want to make sure that I

7      have the benefit of the additional arguments that Mr. Peña

8      made by joining them at this point.

9              And I also would respectfully request the Court to

10     include in the Record only the John Shaw declaration I

11     submitted to the Court so it can be of Record what I attempted

12     to submit I understand you're not taking into consideration.

13             THE COURT:  Because there was a deadline and I've

14     heard no good excuse for why the deadline wasn't met --

15             MS. ORR:  Well, respectfully, Judge Alvarez, I think

16     there was a good excuse and I offered.

17             THE COURT:  I didn't hear it.

18             MS. ORR:  But I merely wanted to make a --

19             THE COURT:  That you just received yesterday.

20     Receiving something the day before doesn't necessarily explain

21     why that wasn't procured earlier.

22             MS. ORR:  I explained I had to read the transcripts

23     that I belatedly got --

24             THE COURT:  No, you actually didn't explain, but --

25             MS. ORR:   -- respectfully, Your Honor.

1          THE COURT:   -- but --

2          MS. ORR:  And so I would just ask --

3          THE COURT:  Okay.

4          MS. ORR:   -- you to make it part of the Record

5     only.

6          THE COURT:  Regarding the transcripts, yeah, let it

7     go because we're here now, but --

8          MS. ORR:  Yes.

9          THE COURT:   -- the transcripts were on the docket

10    as I noted in my order.  You responded and indicated that you

11    couldn't access them.

12         MS. ORR:  Yes, ma'am.

13         THE COURT:  That was not presented to the Court in

14    the motion presented to the Court.  In that response you also

15    indicated that Mr. Garcia was able to access, Mr. Garcia was

16    trial counsel and your co-counsel, and I received no

17    explanation for why you couldn't have reached out to

18    Mr. Garcia to access those for you.  And Mr. Garcia practices

19    here regularly.  If he was trying to access them and couldn't

20    access them, you know, he knows that's --

21         MS. ORR:  Yes, Your Honor.

22         THE COURT:   -- an easy fix and it's an easy fix.

23         MS. ORR:  That's in my status report and --

24         THE COURT:  No, no, that wasn't in our status

25    report.  No, what you said in your status report was that they

1    weren't going to be produced and even though they were in the

2    Record, then you couldn't access them, but you didn't tell me

3    that your co-counsel who practices here regularly did anything

4    to reach out to the Court to make the Court aware that you

5    couldn't access them.

6         MS. ORR:  Well, I don't know if he did or did not,

7    Judge Alvarez --

8              THE COURT:  That's what I'm saying --

9         MS. ORR:   -- but I did --

10             THE COURT:   -- you could have called him.

11        MS. ORR:   -- obtain them from him, and I appreciate

12   that, and I filed the email with the Court when I obtained

13   them.

14             So at any rate I'm not trying to go back and argue

15   with Your Honor about the decisions you've already made.  I do

16   take exception to them for purposes of the appeal, and I just

17   respectfully request that the Shaw declaration just be made a

18   part of the Record for purposes of the appeal, not -- I'm not

19   quibbling with Your Honor about your decision to consider it

20   or not to consider it.

21             THE COURT:  You -- I'm returning it to you, you can

22   raise it with the Court of Appeals, but, no, I'm not taking

23   it.

24        MS. ORR:  Thank you very much, Your Honor.  I'll

25   file it with the clerk.

1          THE COURT:  All right.  Okay.  So that addresses --

2     actually for Mr. John Cuellar I'll take all of that with

3     Mr. Cuellar complete with Mr. A.C. Cuellar and

4     Mr. Quintanilla.

5          Okay.  So for Mr. A.C. Cuellar does the Government

6     then wish to address any of its objections?

7          MR. GULLOTTA:  There were 2 additional matters that

8     the Government has raised, the first being essentially very

9     much the same argument that I just made with respect to

10    Mr. Quintanilla, which is that, again, Mr. Arturo Cuellar

11    controlled John, he told him when the payments were coming,

12    how much he was going to get, he decided when the payments

13    were going to stop, he decided to use (indiscernible).  He was

14    controlled -- he completely controlled the situation and

15    managed and supervised John to a very clear degree I think you

16    saw from John's testimony.  So the Government argues that the

17    manager/supervisor, again a mid-level increase is applicable

18    here.

19         THE COURT:  In that regard I do think that the

20    evidence at trial showed that, yes, Mr. A.C. Cuellar had a lot

21    of influence over Mr. John Cuellar, and that may be a fact to

22    consider as far as role, but I think overall that I see

23    Mr. A.C. Cuellar also as being the average participant here,

24    so that objection is overruled.

25         MR. GULLOTTA:  Okay.  And just for the purposes of

1    the Record, and it's in our briefing and it'll be part of the

2    argument on the -- these offenses probably could not have

3    occurred but for these 2 Defendants, because they had the

4    access to the public official.  So I do respectfully continue

5    to believe that they played a more significant role because

6    had they not been able to give Leo Lopez the access to those

7    public officials, this may have never occurred.  But I

8    understand the Court's ruling.

9         And the only other remaining issue that the

10   Government raised is the abuse of private trust issue.  And so

11   I -- you know, we briefed it in our filing, I looked for cases

12   where there were 2 public -- or 2 trusts at issue.

13   Mr. Cuellar both had a public trust and then the underlying

14   offenses that are addressed in 2C1.1 obviously involve public

15   trust.  And as I noted for the Court, there's an application

16   note that just simply says, Do not file 3B1.3.

17        And in looking at the case to exist on this

18   particular application, it does seem pretty clear that the

19   concern is about double counting.  And because Mr. Cuellar

20   held a separate private trust with his role at QRM, that is

21   completely unaddressed by 2C1.1, that I think the concern

22   about the whole county is not present here.

23        You know, we heard from Lucy Lozano, she was part-

24   owner of that company.  He used the company, he used the

25   company's money and involved the company in a bribery scheme

1    which is a very -- just look at the way the abuse of private

2    trust is described and the examples that the guidelines give,

3    that's exactly it.  The only reason it might not apply is

4    because he also abused the public trust.

5         And it's just not contemplated in the book and I

6    didn't find anything in the cases, so I understand the Court

7    may struggle with that.  But I do think it's a fair argument

8    to make that because it does seem clear that the concern is

9    double counting, and this would not constitute double

10   counting, this is a completely separate private trust that's

11   applicable.

12        THE COURT:  And while I agree that there was abuse

13   of trust, I pulled up the guidelines, they do not apply and

14   it's -- I don't think there's anything ambiguous about that

15   and I think it may be something I can consider overall in

16   sentencing, and if I stay in the guidelines, one of the

17   guidelines, if I go outside the guidelines, what I do, but

18   even though I may think that it is a situation not

19   contemplated by the guidelines, it says, do not apply, so I'm

20   overruling that objection and not applying that.

21        THE COURT:  Thank you, Your Honor.

22        THE COURT:  Okay.  So as far as guidelines for

23   Mr. A.C. Cuellar and Mr. Quintanilla, I think I've addressed

24   everything as far as guideline calculations themselves.  Does

25   anybody disagree with that?

1           (No audible response.)

2           THE COURT:  All right.  All right.  So then let me

3      hear fully, and I'll start with Mr. Quintanilla, and,

4      Mr. Quintanilla, in this case I will have you and Mr. Peña

5      step forward.   My intention is to hear fully from Mr. Peña

6      and Mr. Quintanilla.  Do you wish to say anything to the

7      Government, and then proceed to sentencing for

8      Mr. Quintanilla, then I'll turn to Mr. Cuellar, A.C. Cuellar.

9           MR. PEÑA:  I outlined, Your Honor, two of the

10     reasons.  One is a downward departure, and this is where the

11     Court now, after having calculated everything, starts

12     considering some other factors.  And one of the factors that

13     was presented in our memo is is his health.  And as the Court

14     is aware just by the trial, we had to actually continue the

15     trial because he had to undergo an emergency bypass.  He went

16     through that bypass so now there's a reduced life expectancy

17     whenever something does happen, and Your Honor is aware of

18     that, and it's (indiscernible).

19           And so as a result of that, that's consideration for

20     the Court.  And the Court can impose a sentence and not

21     downward depart from what the guidelines recommend at this

22     point, that that would obviously be pretty much a life

23     sentence for Mr. Quintanilla.

24           The second issue that we briefed in the motion, Your

25     Honor, is the family.  And we went into some details as far as

1        the family issue.  The family issue is he is the main

2        breadwinner of the family, he's the one responsible for caring

3        for the family he has.  And so as we briefed in the motion

4        were some sensitive issues that if he is not home, it could

5        have an affect on many other people in this case.

6               And the final one, Your Honor, is the other

7        consideration of abhorrent behavior, which is this is -- he

8        has a long history of working within the community.  He has a

9        long history at the same job, he's not a man who jumps from

10       job-to-job, he's been a salesman for many years and gets

11       support from it.

12              He also -- and there was testimony during the trial

13       that he has been an advocate in the City.  Any time there's an

14       issue with the streets, any time there's an issue with things

15       like that he is the one at the meetings and he was a fixture

16       at the meetings.  He was the one advocating for those things

17       prior to running for office, it wasn't successful, but that's

18       always been his thing is how can I make the community better.

19       And in the end he felt that the water treatment plant was

20       better for the City because the water, as you can see, has a

21       long history of.

22              So for those reasons we'd ask the Court to depart

23       from the guidelines and to render a sentence that would be

24       more commensurate with, one, his actual involvement, his

25       benefit, and what he means to the community, because this is

1     not a charge, it's a violent charge.  This is, you know,

2     ultimate, Your Honor.

3           And in that case because of the need, because one is

4     life expectancy and because they need him in the family and

5     because how could he actually benefit which he will dedicate

6     benefitting which he's already demonstrated in many different

7     ways, and he's like to speak to Your Honor at least to that

8     degree.

9           We believe that community service, a long probation

10    if necessary because the Court's have ruled -- I mean

11    probation is not freedom, I mean there's a lot of -- like he's

12    had to live for the last several years.  You have to be

13    reporting, he's always been cooperative, has already reported,

14    but he ain't going to -- he's not going to go anywhere for

15    that information, and he's (indiscernible).

16          So for those reasons, Your Honor, we'd ask that.

17          THE COURT:  All right.  And also so that you're

18    aware, if you want to address it, concerning restitution and

19    fines.  And so if you want to address anything in that regard.

20    I received no financial information for Mr. Quintanilla so.

21          MR. PEÑA:  And, Your Honor, and so he's been on a

22    fixed salary, so his financials are very simple.

23          THE COURT:  But I got nothing.

24          MR. PEÑA:  Oh, I understand that, Your Honor.  But

25    he gets a paycheck and then from that paycheck he pays his

1    bills.  But as far as the restitution, the only way there's

2    any chance of any restitution as far as what he would be

3    responsible for, helping with the Government's (indiscernible)

4    could be if he works, and if he works and dedicates it to that

5    purpose.

6         THE COURT:  You know, I sometimes get people mixed

7    up when I'm doing multiple defendants, but didn't I get a

8    letter from a sibling that he also manages family property?

9         DEFENDANT QUINTANILLA:  Yes.

10        MR. PEÑA:  Yes.

11        THE COURT:  Yes.  Okay.  So I assume he gets

12   something from that as well?

13        MR. PEÑA:  Well, Your Honor, these are very small

14   low rent --

15        THE COURT:  But see here's the problem when I don't

16   get no financial information and then family reveals these

17   things to me.  I have to consider everything presented to me,

18   and he has a family business that apparently he's the manager

19   for and --

20        MR. PEÑA:  So the contacts needed to be investigated

21   by the probation officer.  Mr. Quintanilla is not a wealthy

22   man.  Mr. Quintanilla lives in a very modest home.

23        THE COURT:  Mr. Peña, here's my problem, okay.

24   You're just telling me these things.  I do like to go based

25   on, you know, what I have and the reports that -- you know,

1    especially for a crime involving these sums of money.  If the

2    Defendant chooses not to reveal any financial information,

3    then it leaves me with no sort of beginning ground here to

4    assess those fines, so I go based on what I can consider.

5            MR. PEÑA:  Well, and the probation officer on the

6    first, they're the ones that did the extensive investigation.

7    I don't know what information they got --

8            THE COURT:  They did it for Mr. Quintanilla.  They

9    asked Mr. Quintanilla for it so.  Okay.  All right.  Anything

10   else, Mr. Peña?

11           MR. PEÑA:  No, Your Honor.

12           THE COURT:  All right.  Mr. Quintanilla, is there

13   anything you wish to say?

14           DEFENDANT QUINTANILLA:  Your Honor, I just want to

15   say that I'm deeply sorry to my family for what I put them

16   through.  I made a promise years ago growing up without a dad

17   that I would never leave them.  Fast forward, here I am, doing

18   something, you know, that happened in my life the past 3

19   years.  And I've learned what's really important in my life is

20   my family, my kids.

21           Going through some issues with my daughter with her

22   mental problems, I want to give back to the community, Your

23   Honor.  I want to create a program where family members who

24   are suffering with the children, right, and there's support

25   out there.  There's real no support for family members who are

struggling with their children.  There's none.  And me and my
wife had talked about it and talked to my preacher in the
church, I talked to another guy who had issues with his
daughter too, and so we've got to create something and that's
why I feel that has gotten me these 3 years.  I'm trying to
give back to the community.  And if you allow me, that's my
goal, that's my ultimate goal, to get there.

As far as working, I've been working for the same
company 26 years, they've been supporting me all these years.
And, yes, Your Honor, I have the financials, I had an issue
getting them from the person that had them.  But I -- my goal,
Your Honor, is to give back to my -- to society, to give back
to the community.  That's my goal.

I've ruined this (indiscernible) all here.  I mean
after my heart attack everything changed, and I don't want to
waste one more minute, Your Honor.  And thank you, Your Honor,
and God bless you.

THE COURT:  Thank you, Mr. Quintanilla.

Anything from the Government?

MR. GULLOTTA:  Your Honor, I do have prepared
remarks.  Is the Court going to sentence Mr. Quintanilla prior
to hearing --

THE COURT:  Initially I said I was going to, but I
think I'd like to hear fully from Mr. A.C. Cuellar and then
I'll pronounce sentence, because much of what I will say to

1     each is going to be the same, so.

2              MR. GULLOTTA:  Because my comments I think can

3     address both Defendants --

4              THE COURT:  Both, okay.

5              MR. GULLOTTA:   -- so I'll wait till the end.

6              THE COURT:  Yes, okay.  So we'll wait till the end.

7     Okay.  So you can go ahead and be seated now.

8              DEFENDANT QUINTANILLA:  And, you know, one more

9     thing.

10             THE COURT:  Yes, sir.

11             DEFENDANT QUINTANILLA:   -- I was going to say this,

12    as far as getting the restitution paid, that's something I

13    will do.  Like I said, I've been working for the same company

14    for and there's a couple of letters from my corporation.

15             THE COURT:  Right.

16             DEFENDANT QUINTANILLA:  That I would take care of in

17    the next 90 days if you allow me -- I mean I don't want to --

18    I want to continue giving back to society and I will pay my

19    debt.

20             THE COURT:  Keep in mind though, I'm considering

21    restitution of several million dollars --

22             DEFENDANT QUINTANILLA:  Well, then --

23             THE COURT:   -- I mean, you're saying the next may

24    be tough.

25             DEFENDANT QUINTANILLA:   -- sorry.

1          THE COURT:  All right.  Okay.  All right.  Then you

2     may be seated.

3          All right.  Then Mr. A.C. Cuellar and Ms. Orr, we'll

4     hear from you.  All right.

5          You may proceed, Ms. Orr.

6          MS. ORR:  Thank you, Judge Alvarez.  So I would

7     start by just reminding the Court that under 28 USC 994 that

8     the -- when Congress charged the Sentencing Commission with

9     coming up with guidelines, they charged them to consider other

10    sentences other than the guidelines -- or, sorry, recognizing

11    a sentence that was different in kind for first offenders

12    who've never been convicted of a crime.  And we just don't

13    have much of that in the guidelines other than the criminal

14    history categories.

15         I also briefed to the Court the recognition by many

16    commentators and some courts that have accepted an alternative

17    to the sentencing guidelines in financial crimes because

18    they're so harsh when the numbers get so high so quickly.  And

19    I had recommended to the Court the shadow guidelines and cited

20    the cases where some courts have followed those.

21         Lastly I would commend to the Court what you had

22    filed before you by Mr. Carlos Garcia, the sentencing letters

23    that reflect a life not only of no criminal offenses, but a

24    great deal of altruism, not only caring for people in his own

25    family, but people throughout the community, and a history of

1   that.

2             THE COURT:  I did read all of those, and including

3   the one from, I believe it's from a relative of mine that

4   was written --

5             MS. ORR:  Oh, fine.

6             THE COURT:   -- so, yes, I read all those letters.

7             MS. ORR:  Thank you, Judge Alvarez.  And then

8   finally as I noted in my pleading that Mr. Cuellar is going to

9   go -- undergo a heart catheterization, he had his registration

10  for it, and that he has that scheduled.  He need it for his

11  heart because he's having some problems with that, and that's

12  been set out in the sentencing memo.  And I know Mr. Garcia,

13  my colleague,  had provided the probation officer the full

14  medical reports he got 6 says ago.

15            So those -- for those reasons, Your Honor, I would

16  respectfully request the Court vary downward in imposing a

17  sentence that's not more than necessary to punish Mr. Cuellar

18  and to, you know, recognize the whole human being and the

19  whole of his life including the offense conduct of course,

20  Your Honor, and his age and his health as well.

21            THE COURT:  Mr. Cuellar, is there anything you wish

22  to say?

23            DEFENDANT A. CUELLAR:  No, ma'am.  No, Your Honor.

24  I don't have anything to say.

25            THE COURT:  All right.  Thank you.  Then you can go

1      ahead and be seated, I'll hear from the Government and then

2      I'll pronounce sentence.

3              MR. GULLOTTA:  Thank you, Your Honor.  The Court has

4      received complete briefing from the parties so I'm not going

5      to restate everything that's in the Government's memoranda.

6      But I do want to summarize a few key points.

7              This case has the -- has an enormous potential for a

8      deterrent effect.  Okay.  Remember what happened in Weslaco,

9      that's what people will say after today.

10             THE COURT:  And I take it we have no official or

11     person from the City of Weslaco here to address that?

12             MR. GULLOTTA:  Not that I'm aware of.

13             THE COURT:  Okay.

14             MR. GULLOTTA:  So that's what people will say after

15     today, and what that means will be determined by what the

16     Court does today.  The next time someone in Weslaco or a town

17     like Weslaco in the Rio Grande Valley is approached with an

18     opportunity because he knows somebody from high school who's

19     on the City commission or something like that, what is that

20     person going to do?  Okay.  A hardworking person in the

21     community when faced with a very lucrative opportunity is

22     going to be tempted.  That's why what happens in this case is

23     so important.

24             If Ricardo Quintanilla and Arturo Cuellar are given

25     light sentences, the message that that sends to the next

1    person in that position is maybe it's worth the risk.   There

2    are millions at stake here, maybe it's worth the risk.   Okay.

3    The fact that one of the Defendants is asking for probation

4    today even reflects that he is not viewing this as a serious

5    matter.

6              These are not crimes of necessity, these are not

7    desperate defendants involved in a drug crime, or a gang

8    related crime, or an immigration crime.   These are Defendants

9    who were living well.   They had the support of their

10   community, the constituents, they had financial resources and

11   they had power.   And instead of being satisfied with those

12   circumstances, they used them to get more.   It's a very

13   serious offense.   But the community by and large, not just in

14   the Rio Grande Valley but in the United States, feels that the

15   Government doesn't take white collar crimes seriously.

16             This is a case where we need to dispel that notion.

17   Deterrence is a critical factor, the offense conduct is

18   serious as well.   The Defendants were not merely bag men who

19   took money from Leo Lopez and gave it to somebody that Leo

20   Lopez told the to give it to, these were people who had access

21   to public officials.   They were necessary to commit the

22   crimes.

23             So their roles were critical, they were not minor

24   players and this is not an argument for the enhancements we've

25   already discussed, but it's an evaluation of the nature and

1    seriousness of the offense, as 3553(a) requires us to do.

2    They each also dictated the terms and instructed the public

3    officials on what to do.

4         The offense conduct is serious and warrants a low-

5    end guideline sentence.  The guidelines themselves confirm how

6    serious the Sentencing Commission views bribery offenses to

7    be.  As I put in our memo, Amendment 666 states, This

8    amendment increases punishment for bribery, gratuity and

9    honest services cases, just like this one, while providing

10   additional enhancements to address previously unrecognized

11   aggravating factors inherent in some of these offenses.  This

12   amendment reflects the Commission's conclusion that in general

13   public corruption offenses previously did not receive

14   punishment commensurate with the gravity of such offenses.

15        The corruption of our system is a serious crime.  It

16   impacts the way residents view their Government.  These

17   Defendants deprived the City of Weslaco of their right to

18   honest services.  And so let's turn to the victims in this

19   case the residents of Weslaco and the City of Weslaco.

20        The Defendants have put forth several letters

21   describing their efforts to help family and friends, including

22   monetarily.  But in my experience this is not uncommon in

23   white collar cases.  Defendants in white collar cases often

24   take care of the people in their inner circle.  It's the

25   people outside of their inner circle who they commit the

offenses against and that is the people of the City of Weslaco.

And let's not forget this case and the contracts at issue were about the City's water.  This wasn't about a sports stadium or a new shopping mall or something that the City of Weslaco's residents might have enjoyed, but not necessarily needed.  This was about clean water.  Every resident is entitled to clean water, and that is the field upon which these Defendants played their game.

And it's not just an abstract concept.  It's hard to imagine the entire City as a victim, or all of its residents.  But we heard from one.  We heard from Elizabeth Walker, and she has dedicated her career to work in the Rio Grande Valley.  And despite a serious illness she wanted to participate because this mattered to her.

And when she thought she might not be able to, she -- we asked, and the Court allowed and she provided a videotaped deposition just in case she couldn't be here.  And frankly she probably could have gotten out of testifying if she wanted to because she had made that video, but she wanted to be here and we saw her use a walker and a mask to testify because this case matters to her.  And she's just one example of a resident who cares, so it's not an abstract concept.

And going back to my original point, anyone in this area who is presented with this opportunity in the future

1    needs to know that the Court also takes it seriously.  So for

2    these reasons and for the reasons stated in our memorandum we

3    ask the Court to issue guideline sentences to both Defendants

4    as well as the monetary penalties outlined in our memorandum.

5    Thank you, Your Honor.

6            THE COURT:  Thank you.

7            Okay.  Let me have Mr. Quintanilla and Mr. A.C.

8    Cuellar back in front of the Court.  And I didn't say for

9    Mr. A.C. Cuellar but the guideline range is 360-to-life for

10   Mr. A. C. Cuellar so.

11           MS. ORR:  I thought it was without the 2 obstruction

12   points, Your Honor, and that would bring it --

13           THE COURT:  Oh, you're right, I did take those -- I

14   did those down 40, so you're right.  So it ends up being the

15   same for each Defendant.

16           All right.  So, Mr. Quintanilla and Mr. Cuellar,

17   I've noted I've read everything that has been presented to me

18   on your behalf, I've read everything the Government filed, and

19   I'll start with just some general comments.

20           And the first one goes to the issue as far as the

21   waste water treatment plant, and this morning I heard a story

22   on the news that a community outside of Scottsdale, Arizona,

23   that apparently was getting all it water from Scottsdale,

24   Arizona and Scottsdale because of the fact that they're

25   suffering a drought cut them off so I can't remember how many

1    residents, it was a small community, but they said now their,

2    you know, water is going -- they're going to have to, you

3    know, pay triple probably what they were paying before to

4    obtain the water.

5          And it made me think of this case because frankly

6    the City of Weslaco wasn't completely without water.  But in

7    many of the small communities around here, I've lived in the

8    City of McAllen for a very long -- recently and before that it

9    was a long time ago.  I didn't experience in McAllen where

10    they gave you the boil water notice, but having at one point

11    in time lived in Donna, I would get those notices more often

12    than I liked.  You know, it happens sometimes.  But even the

13    boil water notice isn't quite as bad as having a whole waste

14    water treatment plant that needs replacing.  So the City was

15    in a situation where they did have to do something, they have

16    to act.

17          Both of you were active members of your community,

18    and I agree with much of what the Government said, both of you

19    were in a position where, yeah, certainly you had done a lot

20    of good to family and friends, and maybe in some instances

21    even people who were not in that category, but one way or the

22    other came to your attention, and that's all certainly very

23    good and it speaks well of you.

24          But when this opportunity came along and when it was

25    a situation where the City really was in desperate need of the

facilities that were to be constructed, or reconstructed here, and you saw this opportunity, rather than thinking I need to work to ensure that my community has good drinking water, the community has these services at the best possible price for them, that the citizens of the City do not end up having to pay more than is absolutely necessary for this necessity.

And you sort of closed your eyes to all of that and you really looked at how do I line my pocket with some of this money.  And didn't do it one time, didn't do it two times, did it over the course of some time here.  And while ai appreciate the good things that you've done in your community, I, again, agree with much of what the Government said.  Remember we're looking at public corruption.  I believe it is more than just the particular actions at issue that I have to consider.

And the different, you know, different scenario I often hear from defendants, well, different as far as the offense, not different as far as sentencing, and I often hear from defendants who are coming into the country illegally about situations at home and had caused them to flee and they tell me in many of those instances, you know, I can't go to my public officials because they're involved in this, you know -- or they're cartels or they're involved in corruption is a good way -- whether those public officials are, you know, City employees, law enforcement, any other type of public official, but in many instances they, you know, like they don't trust

1    them.  And totally justifiably don't trust them, okay?

2         We can't have that in our communities.  If our

3    public officials can't be trusted, then we really do become a

4    lawless society and public corruption I think does require

5    more from  the officials -- no, I'm sorry, public office does

6    require more from those officials than just your average

7    citizen.

8         If you're an average citizen and you walk into the

9    local convenience store and they mistakenly give you change

10   for a 20 when all you gave them was a 5, yeah, you should

11   return it, absolutely, no question about that. But if you walk

12   away with it, you know, you're impacting the store but you're

13   not necessarily impacting somebody else who walks into the

14   store and has the same thing happen to them, because it's

15   independent, there's no issue as far as the store itself

16   having engaged in any wrongdoing here.

17        But when we have a public official who is willing to

18   accept bribes, to line their own pockets, especially for a

19   necessity like this.  And I do think that part of what the

20   Court has to consider are what the public perception is in

21   those cases.

22        And recognize when Ms. Orr touched on as far as

23   what, you know, some courts refer to as the shadow guidelines

24   and I recognize that some courts believe that when we're

25   dealing with white collar crimes because generally you have

people that are otherwise law-abiding, who otherwise come from a decent family, who otherwise have done good in the community, that they sere a lesser sentence somehow.

And it troubles me because, and not that either one of you came from privilege by any means, but certainly you have done well in your, you know, adult life.  And sometimes we have individuals who have come not just from environments where they struggle financially, but environments where they didn't have decent parents, they didn't have a good neighborhood, they didn't have the advantages of being able to reach out to family for support where they basically from a very young age would like to struggle on their own, and so in those instances I think, Yeah, maybe it's not so unusual that they have engaged in some kind of criminal conduct to address you know, their needs.

I had a young man this morning who said, you know, I engaged in criminal conduct because my mother was in desperate need of surgery and there's no way we could gather the money. He doctor said, You could sell 3 houses and it wouldn't be enough money, and they were in Mexico.  And so he said, So I thought this was a way to make money.  He said unfortunately here I am and my mother didn't get her surgery and she died.

You know, so somehow you can understand why they go down that path, but I quite frankly have been at a loss to understand why you went down this path.  Nothing I've seen or

heard explains to me or gives me an inkling of why you would

go down this path, other than the money that used to profit.

I am particularly troubled, Mr. Cuellar, in the

instance where you come up with a scheme to bribe Mr. John

Cuellar through their business.  It is, you know, it's beyond

comprehension that a man with your business experience would

do that, because I do agree with the Government that that was

a abuse of trust though with that company.  I've not applied

the enhancement because I think the guidelines say do not do

it, it doesn't say do not do it unless.  So I'm following the

guidelines in that regard.  But I think if the guidelines

didn't have that language, you know, I'd be looking at that as

another enhancement as well.

But for both of you I believe that this was a

situation where you were thinking of yourself without giving

any real thought to your families during this period of time,

that perhaps because everybody accepted the unknown -- a

citizen of Weslaco and the unknowing commissioners when

everybody else was willing participants, and in your mind you

thought nothing of it.  And because the City actually needed

these services that you thought nothing of it.

The Court considers all that is required to

consider, the Court considers all  the 3553(a) factors.  And

like I've said, I've read the numerous letters written on your

behalf.  And, Mr. Quintanilla, I was particularly impressed

1       with the mother of you child and the letter that she wrote.

2       She talked about your relationship with your son, and

3       certainly it speaks well of you.  I will say that sometimes

4       maybe we set the standard so low that when somebody is meeting

5       to exceeding those standards, you know, we're just unduly

6       impressed.  You know, you're doing what a father should do.

7       That is what a father should do.  So it's a good thing

8       obviously, but what I'm saying is that it's what any father

9       should do.

10              Mr. Quintanilla, as I said, I read those numerous

11      letters, and I will go it again, but, you know, even a

12      relative wrote on your behalf.  And certainly I recognize that

13      you've done a lot of good in your community.  In your case I

14      was particularly impressed by the story of you taking more or

15      less this young man with disabilities under you wing and

16      provide for him, and certainly that speaks very well of you.

17              But we do have to consider more than just that be

18      cause what we're looking at here is criminal conduct.  If you

19      were being considered for citizen of the year, you each might

20      have been good contenders here, but we do have this crime that

21      went on over the course of some time, that over the course of

22      that time involved millions of dollars.  It is impossible, I'm

23      sorry that the City isn't here, it is impossible to say what

24      the cost to the City will be.  There is no way to go back in

25      time and redo this.

One of the considerations in the guidelines when it speaks out about determining loss is what cost the City might have to incur to cure these issues, and quite frankly I don't think that can be determined.  They may ultimately recover some from these entities, but I don't know that they'll ever really be in the same position as if they had moved forward without this.  And the citizens of the City of Weslaco, they will continue to deal with these issues I think for quite some time.  But without having received from them anything more that they did receive it, the Court, you know, goes far with what it has here.

The Court will say one last thing in that regard considering for each one of you your particular circumstances here, you know, and considering for each one of you the guideline range that we're in.  I do believe that a slight departure -- actually it will be a variance, a slight variance is warranted here.  I have, in a few cases over the course of my life as a judge, sentenced people to life, but with one exception that has generally been in cases where there was a death resulting through the offense, so I hesitate to have to send somebody to prison for what is essentially going to be life.

And I know that it's impossible to predict regardless of what age, how much time they have, and even doctors with their medical science can't always tell you that.

1    But I do believe that that is a consideration in this case,

2    and recognizing that I believe that although I am convinced

3    that I have made the proper determination as to the guideline

4    calculation, I do believe that it results in a guideline range

5    that is higher than is necessary to fulfill all the 3553(a)

6    factors.  So the Court as I said is going to render the

7    various entities' request based in large part of what has been

8    presented to the Court through each counsel for each

9    Defendant.

10        For Mr. Cuellar I do take into account the fact that

11   you profited more in this case and maybe with the exception of

12   Mr. Lopez, who is not -- you know, never going to be before

13   the Court, you -- these Defendants did profit the most here.

14   The Court is going to sentence you to a term of 240 months in

15   custody.

16        For Mr. Quintanilla, although you fall into the very

17   same category here, the Court does take into account that what

18   you profited here was a lot less.  But again, believes the

19   Court has properly calculated and the Court believes that

20   profit was not necessarily by your own design, that it was

21   just the way things played out here.  But I will give you an

22   additional variance here lower than what Mr. Cuellar has

23   received.  In light of that the Court is going to sentence

24   you, Mr. Quintanilla, to a term of 200 months in custody.

25        The Court in imposing that sentence for each one of

1     you has considered all the 3553(a) factors and the Court

2     believes that that sentence is sufficient but not greater than

3     necessary to meet all those factors.  In doing that the Court

4     considers the guideline range but also does consider the need

5     to promote respect for the law, to deter further criminal

6     conduct and to address the public corruption issues that are

7     always prevalent in these cases.  That is not a specific

8     factor in the statute, but it is something that the Court

9     considers nonetheless.

10          Addressing the issue as far as term of supervised

11     release for each one of you the Court is going to place you on

12     a 2-year term of supervised release.  I believe that is all

13     that is necessary considering the background that each one of

14     you brings here.  During that time you are to comply with all

15     the standard conditions adopted by the Court.

16          For restitution the Court is going to order in the

17     amount of $4.1 million for each one of you, but that is joint

18     and severable.  The Court is also going to impose here for

19     Mr. A.C. Cuellar a fine per count, and I did receive and I

20     appreciate having received the financial information because

21     it totally helped come up with a -- what I consider to be an

22     appropriate fine here.  The Court is going to order a fine for

23     Mr. A.C. Cuellar of $15,000 per count, that means 61 counts

24     for a total of $915,000.

25          For Mr. Quintanilla, without having received any

1    information regarding the finances but understanding that he

2    was employed, obviously will not be employed for some time

3    after he has been in custody, but understanding that he does

4    have -- or at least at this time have that family-owned

5    business, the Court now is going to order a reduced fine for

6    Mr. Cuellar (sic), the Court is going to order a fine of $1000

7    per each count, and that is 15 counts.

8          For each one of you you also have to pay the $100

9    special assessment per count.  For Mr. Quintanilla that is a

10    total of $1,500, for Mr. Cuellar that is a total of $6,100.

11    And the Court does order forfeiture as was previously ordered

12    and makes that a final order of forfeiture.

13          I think I've covered everything, but, Probation, did

14    I miss something, or my staff, did I miss something on the

15    judgment?  I've got fines, I've got restitution, I've got time

16    of supervision.  I think I got everything.

17          MS. MARTINEZ:  Yes, Your Honor, it appears so.  With

18    regard to BOP recommendations, special conditions, I think

19    that's all.

20          THE COURT:  Yeah, and I don't think I had any -- saw

21    any need for special conditions, so -- unless you see

22    otherwise.

23          All right.  So for both of you you do have the right

24    to appeal.  If you wish to appeal, you need to advise your

25    attorney.  That appeal needs to be filed within 14 days.  If

1      you cannot afford an appeal, you can -- you may filed for *in*

2      *forma pauperis* in which case a clerk will file your notice of

3      appeal and the Court will appoint appellate counsel.

4              There is the issue that each has been out on bond.

5      Where does the Government stand on that now?

6              MR. GULLOTTA:  Thank you, Your Honor.  In light of

7      the significant sentences issued today the Government moves

8      for immediate remand.

9              THE COURT:  The Court agrees with that.  So for each

10     one of you the Court does order that you surrender to the

11     marshals to begin serving your sentence.

12             MS. ORR:  Your Honor, if I could remind the Court

13     that Mr. Cuellar has a heart catheterization that he needs to

14     undergo, and I respectfully request the Court to reconsider

15     him surrendering until after that heart catheterization and

16     further respectfully request that Court recommend that he be

17     confined in the Fort Worth Medical Facility.

18             THE COURT:  I will make the recommendations, but I'm

19     not inclined to postpone surrender.

20             Anything else?

21             MR. GULLOTTA:  No, Your Honor.

22             THE COURT:  All right.  Thank you.  Then you are --

23     counsel is excused.

24             All right.  Then I will proceed with Mr. John

25     Cuellar.

1              (Pause in the proceedings.)

2                      THE COURT:  All right.  Mr. Montalvo then.

3                      MR. MONTALVO:  Your Honor, we -- I'm sorry, I think

4       that this is a little out of the ordinary, but the Court --

5                      THE COURT:  That's all right.  Take your time.

6                      MR. MONTALVO:   -- Your Honor, so we'll take up the

7       issue with the Court if the Court would please, the issue once

8       more I follow the Court has already ruled, I'd like to just

9       make a Record of the fact that we are objecting to the issue

10      of the more than one bribe.  Again, I understand the Court's

11      already made their ruling.  However, I'd like to make the

12      point that the installment payments were as a result of a

13      single action, the trial itself was as a result of bribes paid

14      to a public official.  Those bribes were to ultimately be the

15      objective of obtaining contracts --

16                     THE COURT:  Can you pause for just a second.

17                     Everybody needs to step out and that door needs to

18      be closed, please.

19                     My apologies, it's very distracting to the Court.

20                     MR. MONTALVO:  Yes, Your Honor.

21              (Pause in the proceedings.)

22                     THE COURT:  Mr. Montalvo, you may continue.

23                     MR. MONTALVO:  Yes, Your Honor.  Thank you.  Your

24      Honor, the only -- again, just for the Record we are asking

25      the Court to consider that this was as a result of the

1    objective of the scheme, the bribes that were paid would be

2    considered one sole bribe, or rather a related payment in the

3    essence that it was a single objective of obtaining those

4    contracts.  That's why we'd ask the Court to consider the

5    2-point enhancement for that would be removed on behalf of the

6    sentencing guidelines, or on the part of the sentencing

7    guidelines for this matter, Your Honor.

8              THE COURT:  And that I certainly understand that

9    won't --

10             MR. MONTALVO:  Yes, Your Honor.

11             THE COURT:   -- repeat what I said earlier, but my

12   earlier ruling applies --

13             MR. MONTALVO:  Understood, Your Honor.

14             THE COURT:   -- to this one as well.

15             MR. MONTALVO:  I understand.  I just wanted to make

16   it for the Record, Your Honor.

17             THE COURT:  That's okay.

18             MR. MONTALVO:  The other issue we have, Your Honor,

19   is the role adjustment.  Your Honor, I understand that

20   everybody had a role to play here, but it's been clear from

21   the get-go that there were clearly levels of involvement and

22   levels of participation in this entire scheme.  Mr. Cuellar

23   had been -- previously been -- served as a City commissioner

24   for 12 years for the City of Weslaco, and never even

25   considered any form or any type of ploy or plot or any scheme

1      to call in question his actions, until he was approached by

2      what he would consider nothing more than a figurehead, a role

3      model and the patriarch of his family.

4             Once his father died, that's what -- A.C. Cuellar

5      took the role over.  And as a result I believe --

6      Mr. Cuellar's an intelligent man, Your Honor, I'm not going to

7      question it.  He's a grown man, he makes his choices, his own

8      decisions, he's a licensed attorney.  But again, the influence

9      that Mr. Cuellar had over John was not just as a public

10     official but as a family member, somebody who John would never

11     consider having been steered wrong by him, or trying to

12     recruit him to do something illegal.

13            But again, Your Honor, I'm not excusing his actions.

14     Mr. Cuellar's a grown man and made his own choices.  However,

15     I think there is a hierarchy to this scheme and I believe

16     Mr. Cuellar was, for lack of any other terms in the sentencing

17     guidelines, a minor participant in this.  Yes, he had the

18     position as a City commissioner, however, in the past his role

19     was not more than someone as a public servant, someone who

20     served the City without, again, an inclination of doing

21     anything wrong until he was recruited and told to do what he

22     was asked to do.  Clearly he took payments for that.

23            But again, I'd like to remind the Court that at some

24     point in time Mr. Cuellar wanted to withdraw from this.  He

25     wanted to leave the City of Weslaco.  It wasn't until Leo

1          Lopez and Mr. A.C. Cuellar came to him and sat him down and

2          said, Why do you want to leave, stay here, pay him.  And

3          that's how this scheme continued for all intents and purposes.

4          Your Honor.

5                    THE COURT:  And I understand the arguments you make

6          and I think I tend to agree that there was perhaps somebody

7          with influence here that, you know, sort of put Mr. Cuellar in

8          this position.  But I think that's something I can consider,

9          you know, when I decide ultimately where I am placing

10          Mr. Cuellar, but I don't really think that goes to role.  The

11          bottom line is that Mr. John Cuellar is the public official

12          being bribed here and I don't think that makes him a minor or

13          minimal participant.  I think he is the average participant,

14          so that objection is overruled.

15                    MR. MONTALVO:  Understood, Your Honor.  Understood.

16          The other objections, Your Honor, we had filed, the Court has

17          already ruled on which was the valuation of the bribes, or the

18          payments.  We had the minor role and we also had -- with

19          regards to objections, Your Honor, the Court had ruled on

20          everybody's already, so I don't want to repeat myself or ask

21          the Court to restate the same --

22                    THE COURT:  Anything else --

23                    MR. MONTALVO:   -- positions that would be made.

24                    THE COURT:  All right.  Anything else you wish to

25          say?

1          MR. MONTALVO:  Well, Your Honor, with respect to

2     Mr. Cuellar himself, it's been 4 years, it's been a long time

3     since this started and I've gotten to know Mr. Cuellar.

4     Again, he's been a lawyer for 31 years, he's an intelligent

5     man, has a very big heart with the result of always trying to

6     help people.  Believe it or not that really is who he is.

7          Before having to stand in front of the Court today

8     he did serve as a City commissioner, and despite and before

9     this situation that brings him here today, he did serve the

10    City of Weslaco for many years in a positive capacity, and a

11    capacity in which he did do good for the City of Weslaco and

12    its citizens.  When the decision was made to accept

13    responsibility for the occurrences of this situation his

14    resolve was -- once again it took control over him and his key

15    concern was not the consequences he would face, but the

16    potential effect the plea would cause others.

17          Your Honor, Mr. Cuellar has sincere -- has sincere

18    remorse for his actions that brought him here today.  He did

19    struggle and feuded with himself for quite a while before

20    proceeding to testify as a witness.  The Government can attest

21    to the fact that he struggled with the fact that he would have

22    to testify against for all intents and purposes the patriarch

23    of his family.  Not because he wasn't willing to accept

24    responsibility, but -- for what he had done, but because it's

25    simply not in his nature to believe that he may bring upon any

1    sort of discord upon his own family.

2          Your Honor, we know the Court has a multitude of

3    discretion in passing sentence.  I would respectfully ask the

4    Court for a sentence that is appropriate, not solely on the

5    basis of the offense, but based on the individual before the

6    Court.  I'm sorry, Your Honor, I know that a lot of times, and

7    I'm not saying the Court does, but a lot of times the general

8    public wants somebody sentenced because we're mad at them,

9    because we're disappointed because they let us down.

10         I would ask the Court to consider a sentence not

11   because we're mad at John, I would ask the Court to consider a

12   sentence essentially to determine if we're afraid of John.  Is

13   John Cuellar somebody we wouldn't want back in our community.

14   Is this somebody that we would absolutely want -- not want as

15   our next door neighbor.  I would ask the Court to distinguish

16   between disappointment, being mad at somebody, as the general

17   public would be, and somebody that we're in fear of, and

18   somebody that we wish wouldn't be in our community.

19         I think there's a distinguishable factor there and I

20   would ask the Court to sentence him along the lines of, you

21   know, is John really, really a bad person, or are we just mad

22   at him, are we just disappointed.  All that being said, Your

23   Honor, we're asking the Court to consider all these factors

24   and respectfully sentence Mr. Cuellar to the lowest possible

25   sentence.

1        THE COURT:  Thank you.

2        Mr. Cuellar, is there anything you wish to say?

3        DEFENDANT J. CUELLAR:  Yes, Your Honor.  This is

4   very difficult for me to stand here going -- having so many

5   emotions go through my mind at this time.  I am feeling a lot

6   of humiliation, embarrassment, a lot of shame for things that

7   I brought upon my self.  The citizens of Weslaco gave me their

8   confidence and had confidence in me to represent them, and I

9   was privileged to represent them for many years.

10       And I failed them, I made some really big mistakes

11  in this case, and I haven't forgiven myself and I've thought

12  about this case daily since I was voted out of office in 2014.

13  And I wish I could go back and do it all differently again,

14  because I do feel bad that I hurt the citizens of Weslaco and

15  the City of Weslaco.  And I take this opportunity to apologize

16  to the citizens that suffered consequences of my votes.

17       There were a lot of people that were hurt that I

18  didn't think would be hurt, family members, my brothers, my

19  sisters.  I feel like I brought a lot of shame to my father's

20  name.  My dad worked a lot of his adult life to serve the

21  community of Weslaco.  And I apologize to my family as well

22  for the weakness I guess I felt during the time frame I was

23  voting this way.  But I feel great remorse for my actions, and

24  I've tried to start making amends and trying to re-establish

25  my credibility, and hopefully one day give back to the

1        community and make this right.

2               And I -- my remorse encouraged me to take

3        responsibility for this case.  And as Mr. Montalvo said, I

4        pled guilty on August 2 of 2019, I have been cooperating with

5        the Government, and we came to a position where they gave me a

6        plea bargain, and I accepted that and I came and stood before

7        you.  And I continued to work with the Government in helping

8        them put this piece together for this offense.  And it was the

9        right thing to do, and I'm glad that I did that.

10              I apologize again to the citizens of Weslaco.  I

11       hope I get a chance to make it up to them.  And hopefully that

12       working with the Government and helping them was a start.  And

13       so now I place this in your hands and hope that I am given an

14       opportunity to make complete -- make it up completely so that

15       I can finally forgive myself for what I did.

16              THE COURT:  Thank you.

17              Anything from the Government?

18              MR. GULLOTTA:  Yes, Your Honor.  As the Court knows,

19       we filed a motion under seal relating to this matter.  I do

20       want to just add a little bit to it.  I can say sort of

21       anecdotally that I got into this case probably later than any

22       of the attorneys at trial.  The first civilian witness I met

23       with was Mr. John Cuellar.  He met with us as frequently as we

24       needed, he met for as long as we needed.  And sometimes I

25       think he probably wanted to leave for even longer, but we had

1    a lot to do.

2          But I say that because John Cuellar pleaded guilty

3    early in this case.  He pleaded guilty before Mr. Lopez passed

4    away, so he didn't know that he would become an even more

5    important witness to the Government.  But he did become an

6    important witness to the Government.  And I sat with him

7    longer than this Court will have the opportunity to have John

8    and I can say that I felt a genuine desire to do the right

9    thing as he just described.

10          I didn't -- I've sat with a lot of cooperators in a

11    lot of different kinds of cases over the years, and some of

12    them you can just tell are trying to get the most out of

13    bargaining as they can.  And with -- understandably so.  I did

14    feel a genuine desire to make up for his mistakes, and he did,

15    he delivered.  And he withstood aggressive cross-examination,

16    he testified truthfully and completely and he held up his end

17    of the bargain, and I think it's important that the Court know

18    that from the Government's perspective as we've sat with him

19    for hours in working through that.

20          The Government is in ways limited in terms of what

21    it can recommend.  And absent those limitations may recommend

22    an even greater departure.  The Court is obviously not limited

23    by our recommendation, but I want -- I think what's probably

24    coming across is a full support for the departure from the

25    guidelines for John Cuellar because I do believe him and I've

1    had the opportunity to assess his character in a way that

2    makes me comfortable recommending that to the Court.  So I ask

3    that Your Honor take all of that into consideration, as well

4    as the things that we put in our memorandum, and depart from

5    the guidelines.

6           THE COURT:  Thank you.

7           Mr. Cuellar, the Court does consider all that has

8    been presented, and, you know, all that I said to Mr. A.C.

9    Cuellar and Mr. Quintanilla about the offense itself applies

10    in this case as well.  But you sat here, you listened so I'm

11    going to repeat all of that.  What I will say, Mr. Cuellar,

12    and maybe you more than -- Mr. A.C. Cuellar didn't say

13    anything, Mr. Quintanilla did say a few words.

14           But I think one of the things that you said that

15    maybe helps me to understand how you ended up here is

16    basically you saying, you know, this weakness and I think

17    recognizing that really does go a long way on your part to

18    understand how you got into this situation, because I think I

19    sometimes have many defendants who, despite a guilty verdict

20    and despite the evidence quite frankly in some cases being

21    overwhelming they were still adamant that they did nothing

22    wrong, and they don't stop to evaluate their situation to see

23    how they got there.  So I do appreciate that, Mr. Cuellar.

24           I received letters of support on your behalf as

25    well, and certainly I was impressed with the one from your

1    partner, not so much how he talks about you now but basically

2    how you initially helped him and his family out when you were

3    a practicing attorney and the difference that that made for

4    him and his family even before, you know, he became your

5    partner, how that really changed the course of his life, and

6    more importantly the course of his niece.  So certainly,

7    Mr. Cuellar, there's a lot of good things to be said here.

8            I do appreciate what the Government as noted, and I,

9    like the Government, even though my assessment here is limited

10   on what is presented to me in the trial and then everything

11   else I review, I tend to agree with the Government that you

12   really did make the case.  I think had you not pled early, had

13   you not testified with Mr. Tafolla, and the jury, you know,

14   apparently found him credible.  I think he wasn't quite as

15   strong as a witness as you were.

16           And I think in particular, Mr. Cuellar, your

17   willingness to admit that these payments were not payments for

18   your services as an attorney but what they were, bribes, went

19   a long way.  I think if you had stood by that story the case

20   for the Government would have been a very tough case to prove.

21   I do -- I believe that that warrants some consideration.  The

22   Government's motion goes there, but I agree that maybe

23   something more than what the Government recommends is

24   warranted.

25           And I'll touch finally on what I referenced earlier,

1    and that is that it's sad to me that it's not a unique

2    situation when we have family members involved in criminal

3    enterprises, criminal activity.  It happens more often than

4    one may think.  I do believe that here there was some

5    influence because it was Mr. A.C. Cuellar asking you to

6    participate here, and in particular I think that became very

7    clear to me.

8            One, Mr. Montalvo has referenced when you were

9    thinking of not, you know, making another -- or not continuing

10   with your public services, but in particular when you lost the

11   election and you reached out to Mr. A.C. Cuellar and he

12   basically turned his back on you, I think it became very clear

13   to the Court that despite the family relationship that he was

14   looking to use you and when you were of no more service to

15   him, that was the end of his I guess not necessarily

16   relationship with you but basically his, you know,

17   accessibility.

18           And that said, I do also recognize that, you know,

19   testifying against him was a difficult choice that you made.

20   I think you made the right choice, but I also know that those

21   kinds of situations can often divide a family and sometimes

22   can never heal, and I know from everything presented here that

23   you consider it to be -- family, very important.  So the Court

24   also appreciates that.

25           The Court does believe that it's something more than

1    what the Government has recommended is warranted in this case.

2    I do have to consider, as I said with both Mr. A.C. Cuellar

3    and Mr. Quintanilla, the nature of the offense here.  And this

4    is bribery of a public official.  I believe that considering

5    the offense that it is necessary to impose a term of

6    imprisonment but I don't believe that anything close to what

7    the guidelines recommend, and even the departure that the

8    Government recommends I believe is more than is necessary.

9           The Court is going to sentence you, Mr. Cuellar, to

10   a term of 36 months in custody.  Much of the reason the Court

11   goes with that is what is in the Government's motion and what

12   the Government touched on here, what I've touched on as well,

13   but the Court in that regard, like I did with the other 2

14   Defendants, does consider your personal medical history and

15   that was also presented to the Court here.  So I believe that

16   that sentence concerning all of the 3553(a) factors is

17   sufficient but not greater than necessary.

18          And I believe in light of the fact that you have

19   been under Court supervision for these past several years, I

20   do not see any need for further supervision after, so I am not

21   imposing any term of supervised release.  Once you complete

22   your sentence that will complete your sentence altogether in

23   this case.

24          You do have to pay your $100 special assessment, the

25   Court does in this case order the forfeiture of $405,000, you

1    know, as that reflects the bribery payment, and then the Court

2    does order restitution joint and severable as it did with the

3    other Defendants of $4.1 million.

4            You do have the right to appeal.  If you wish to

5    appeal, you need to advise your attorney.  That appeal needs

6    to be filed within 14 days.  If you cannot afford an appeal,

7    you may file for *in forma pauperis* in which case the clerk

8    will file your notice of appeal and the Court will appoint

9    appellate counsel.

10           And the Court for Mr. John Cuellar is willing to

11   allow him to self-surrender.  Does the Government have any

12   objection?

13           MR. GULLOTTA:  No objection, Your Honor.

14           THE COURT:  All right.  So, Mr. Cuellar, you will be

15   notified of when and where to surrender.  You must do so as

16   you are notified because a failure to do so could result in

17   separate charges being filed.  You'll need to get with the

18   Marshals before you leave so they can get information from

19   you.

20           MR. GULLOTTA:  I'm sorry, Your Honor, I may have

21   just missed it and not write it down, but is there no fine in

22   the matter?

23           THE COURT:  The Court is not imposing a fine in this

24   matter.

25           Anything else?

1              MS. MARTINEZ:  Yes, Your Honor.  For purposes of the

2       judgment would the Base Offense Level be a 35 and a 1?

3              THE COURT:  Yes, ultimately -- I'm sorry I never did

4       say, but, yes, so we -- the Court went with what is in the --

5       and I don't think I ever asked the Government, but I take it

6       the Government is moving for the third point on the

7       acceptance?

8              MR. GULLOTTA:  Oh, I'm sorry, I forgot --

9              MR. MONTALVO:  Yes, Your Honor.

10             THE COURT:  We never did that.

11             MR. GULLOTTA:  My apologies.

12             THE COURT:  Okay.  So, yes, it will be 35 and a 1.

13             MS. MARTINEZ:  Thank you.

14             THE COURT:  All right.  Anything else then?

15             MR. GULLOTTA:  No, Your Honor.

16             THE COURT:  All right.  Thank you.  Then you may be

17      excused.

18             MR. MONTALVO:  We may be excused?  Thank you.

19             THE COURT:  Thank you.

20             DEFENDANT J. CUELLAR:  Thank you, Your Honor.  I

21      appreciate you taking the time here.

22         (Hearing adjourned 4:09 p.m.)

23

24

25                         *  *  *  *  *

1          *I certify that the foregoing is a correct transcript*

2     *to the best of my ability produced from the electronic sound*

3     *recording of the proceedings in the above-entitled matter.*

4       */S./  MARY D. HENRY*

5     *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

6     *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

7     *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

8     *JTT TRANSCRIPT #66761*

9     *DATE FILED:  JANUARY 26, 2023*